## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NYRON HARRISON AND THELMA | * | CIVIL ACTION NO. 20-cv-02916 |
| WILLIAMS, INDIVIDUALLY and on behalf | * | |
| of their minor child K.H. | * | |
| | * | JUDGE:    BROWN |
| VERSUS | * | |
| | * | |
| JEFFERSON PARISH SCHOOL BOARD, | * | MAGISTRATE: NORTH |
| DR. JAMES GRAY, CECILY WHITE, | * | |
| TERRI JOIA, & PATRICIA ADAMS | * | |

**************************************************************************

### SECOND AMENDEDING AND SUPPLEMENTAL COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes NYRON HARRISON ("Mr.

Harrison") and THELMA WILLIAMS ("Ms. Williams"), on behalf of themselves and their minor

child Ka'Mauri Harrison[1] ("Ka'Mauri") (sometimes collectively referred to as the "Harrison-

Williams Family"), both individuals of the age of majority, residents of and domiciled in Jefferson

Parish, State of Louisiana, who represent:

### INTRODUCTION

1.

This case arises from egregious government overreach, a complete lack of common sense

to prevail and correct the glaring failures of local government officials to comply with law, and an

8-year-old boy tripping over a Daisy BB gun in a bedroom he shares with his two younger brothers.

After his brother tripped, the 9-year-old picked it up and moved it. This event would not be

noteworthy, but for 9-year-old Ka'Mauri being within camera view of a Jefferson Parish school

---

[1] In this case, the child's name is already out in the public, and the Harrison-Williams Family has made the decision to publically defend their Due Process rights so this unprecedented matter does not occur to another family. *Cf. Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) (rejecting sealing of information that had already been reported in the press).

teacher. Defendants then falsely and maliciously charged that 9-year-old Ka'Mauri "possess[ed] weapons prohibited under federal law" and recommended that he be expelled from his school. When Defendants were advised that they were not complying with Louisiana law or even their own policies, they doubled down and compounded their errors. The result is a terrifying intrusion into a family's home and a bureaucratic nightmare that unites the Attorney General, ACLU, and NRA in agreement that the parents and child's statutory and constitutional rights have been violated.

## JURISDICTION AND VENUE

2.

All of the events, acts, incidents, and omissions alleged herein took place in Jefferson Parish, Louisiana, and the harm to the Plaintiffs was done in Jefferson Parish, Louisiana. Accordingly venue is proper in this Court.[2]

## PARTIES

3.

Plaintiff, Ka'Mauri Harrison is nine years old, resident of and domiciled in Jefferson Parish, Louisiana.

4.

Plaintiff, Mr. Nyron Harrison, is an individual of the age of the majority, resident of and domiciled in Jefferson Parish, Louisiana. Mr. Harrison is Ka'Mauri's father.

---

[2] Plaintiffs submit that they filed a Motion to Remand based on jurisdictional concerns with the judicial review pursuant to LSA R.S. 17:416, and do not seek to waive those claims on appeal.

5.

Plaintiff, Ms. Thelma Williams, is an individual of the age of the majority, resident of and domiciled in Jefferson Parish, Louisiana. Ms. Williams is Ka'Mauri's mother.

6.

Made Defendants herein are:

A. The School Board of the Parish of Jefferson (hereinafter, the "School Board"), which is a political subdivision of the State of Louisiana, and has the capacity to sue and be sued. The School Board and its office are located in Jefferson Parish, Louisiana;

B. Mr. Clay Moise, a member of the Jefferson Parish School Board, in his individual capacity for the tort of defamation, First Amendment Retaliation, and Procedural Due Process Violations. Upon information and belief, Mr. Moise is a resident of Jefferson Parish[3];

C. Dr. James Gray ("Superintendent Gray"), individually and officially, in his capacity as Superintendent of the Jefferson Parish School System ("JPS"). Upon information and belief, Dr. James Gray is a resident of Jefferson Parish;

D. Cecily White (hereinafter, "Principal White"), individually and officially, in her capacity as Principal of the Woodmere Elementary School. Principal White is an individual of the age of majority, and she is believed to be a resident and domiciliary of Jefferson Parish, Louisiana;

E. Hearing Officer Terri Joia ("Hearing Officer Joia"), individually and officially, in her capacity as a Hearing Officer for Jefferson Parish, and as the deisgnee of the Superintendent at the Due Process Hearing that took place in this matter on September 22, 2020. She is believed to be a resident and domiciliary of Jefferson Parish, Louisiana;

---

[3] Mr. Moise is the only Defendant being added to this action.

And;

F.  Patricia A. Adams ("Ms. Adams"), individually and officially, in her capacity as "Chief Legal Counsel" for the Jefferson Parish School System. Upon information and belief, Ms. Adams communicated and advised all purported decision-makers at all stages of reviewing the proceedings against Ka'Mauri. She is believed to be a resident and domiciliary of Jefferson Parish, Louisiana.

## FACTUAL ALLEGATIONS[4]

### BACKGROUND

7.

Ka'Mauri, age nine (9), is in the Fourth Grade at Woodmere Elementary School ("Woodmere School"). Plaintiffs Mr. Harrison and Ms. Williams are Ka'Mauri's parents. (collectively, all three Plaintiffs are the "Harrison-Williams Family.")

8.

As a result of the COVID-19 pandemic, the parents of the students at Woodmere School, prior to starting the 2020-2021 school year, were given the option for their children to choose between either virtual distance learning or returning to the classroom for on-campus attendance.

9.

The Harrison-Williams Family is a family of seven (7) living in a three-bedroom home in Marrero, Louisiana. Ka'Mauri is one of five (5) children, three boys and two girls. The Harrison-Williams Family made the decision to keep Ka'Mauri and two of his siblings in Distance Learning

---

[4] The Harrison Williams Family re-incorporates all of the Exhibits attached to the original Petition. The Exhibits originally filed are re-filed and identified as Exhibits "A" through "E" and will keep their same letters as the original Petition.

following the re-opening of Jefferson Parish Schools to limit the Harrison Family's exposure to COVID-19. While the Harrison-Williams Family began the 2020-2021 school year with all five children doing Distance Learning, the Harrison-Williams Family placed their five-year-old twins back in an on-campus classroom at a different Jefferson Parish School due to the difficulty of having five children receiving virtual instruction in a three-bedroom home.

10.

Ka'Mauri shares a bedroom with his two younger brothers, ages eight (8) and five (5). Ka'Mauri receives his virtual instruction in that shared bedroom.

11.

While the Harrison-Williams Family attempts to keep their children in separate rooms for their virtual instruction, it is not always possible. Upon information and belief, this is the first year for the Woodmere School to offer virtual instruction, and the live stream classes do not always work as a result of Internet connectivity problems. Sometimes Woodmere School simply does not provide access to virtual instruction for reasons unknown to the Harrison Family. Further, the students participating in virtual instruction also have Physical Education "classes," or "break periods," whereby they are essentially instructed to take a break from the computer screen for the Physical Education period.

12.

On September 10, 2020, Ka'Mauri began taking an ELA diagnostic assessment (the "Test"). According to his teacher, Ms. Leslie Williams, Ka'Mauri became visibly ill during the Test, and that she could see through the computer screen that Ka'Mauri was not feeling well and

"had tears in his eyes".[5] Ms. Leslie Williams advised Ka'Mauri who was in his bedroom that he could resume the Test the following day.

### THE INCIDENT

13.

The following day, September 11, 2020, Ka'Mauri continued the Test. At the instruction of his teacher and his mother, Ka'Mauri muted the microphone to/from his computer to concentrate on the Test. Indeed, virtual learning students are required to keep their microphones on mute when not directly speaking to the class or asking the teacher a question. Additionally, because Ms. Leslie Williams was actively teaching some in-class students, Ka'Mauri muted the teacher's voice to concentrate on finishing the Test.

14.

While Ka'Mauri was taking the Test in his bedroom, his younger brother, age eight (8), was on a break from his virtual instruction, which he had been doing in the family's kitchen, and came into their shared bedroom. Ka'Mauri's younger brother then tripped over a Daisy BB gun in the boys' shared bedroom.

15.

Ka'Mauri picked up the toy BB Gun (a gift purchased from Wal-Mart for his ninth birthday), crossed it over his body (passing the screen), and moved it out of his younger brother's way.[6] Ka'Mauri then went back to taking the Test. Hereinafter, this shall be referred to as the "Incident."

---

[5] Ms. Leslie Williams is the Minor Child's teacher. Ms. Thelma Williams is Ka'Mauri's.
[6] The Woodmere School does not have video footage of the Incident, but no one has disputed the facts of this Incident.

16.

Ka'Mauri **never** pointed the BB Gun at the screen, and he did not say a word to the class or his teacher. There is no evidence that Ka'Mauri was even aware it had been seen. Ka'Mauri believed he was doing the right thing, and he had no intent for his toy BB Gun to appear on the computer screen.

17.

Shortly thereafter, Ka'Mauri saw his teacher trying to get his attention but his computer remained on mute, since he was taking a test. Ka'Mauri's computer screen then abruptly went dark. According to school documents, the connection was cut due to "internet issues" but other children in Ka'Mauri's home did not experience any internet issues at the same time.

18.

Ka'Mauri, knowing that his teacher had been trying to get his attention, went to his older sister's bedroom, and told her he was kicked off his screen. Together, they approached their mother, who was home proctoring her three children.

19.

A JPS document titled the "Louisiana Department of Education School Behavior Report"[7] ("Behavior Report") states that Ka'Mauri:

> left his seat (at home) momentarily, out of view of the teacher. When the student returned, he had what appeared to be a full-sized rifle in his possession. He placed it on the side of his chair so that we could only see the barrel. I immediately called the student's name to ask him what he was doing with a rifle and to have him remove it from the view of the other students. I called his name a few times. He did not reply. The student had muted not just his voice but appeared to have [muted] the volume on his computer as well so that he would not be disturbed as he took the ELA diagnostic assessment.

\* \* \* \* \*

---

[7] See the LDOE Report attached hereto and incorporated herein as Exhibit "A."

I called his name again, but shortly thereafter, the student was disconnected from the screen due to internet issues. At this time I contacted Principal White to inform her of what had just happened. Ms. White immediately sent the behavior interventionist to my room to investigate the matter. I gave a statement, then the behavior interventionist left my room.

A true and accurate copy of the Behavior Report is attached as Exhibit "A." Although the narrative in the Behavior Report is not signed, reason and common sense indicates that this is a statement, or a combination thereof, by Ka'Mauri's teacher, Ms. Leslie Williams and a JPS Behavior Interventionist.

20.

According to the Behavior Report, Ka'Mauri's mother called Ms. Leslie Williams (Ka'Mauri's teacher), to ask about what happened. Ms. Leslie Williams informed Ms. Thelma Williams what happened, and Ms. Thelma Williams, immediately informed Ka'Mauri's teacher that she had seen a toy BB gun, not a rifle. Ms. Leslie Williams advised that she was not familiar with BB guns because she did not have little kids, but immediately accepted Ms. Thelma Williams's statement. Ms. Leslie Williams then reported to Ka'Mauri's mother that the incident had already been reported to the Principal, Ms. White, and someone would contact her.

21.

Ms. Thelma Williams then called to inform Ka'Mauri's father of what happened, at which point, Mr. Harrison, who had been attending to his elderly father, rushed home, assuming Ka'Mauri had done something. Ms. Thelma Williams again called Ms. Leslie Williams's cellphone at 12:51 p.m. and requested that Ms. Leslie Williams explain to Mr. Harrison what happened. As Ms. Leslie Williams was completing her conversation with Mr. Harrison, a behavior interventionist arrived, took Ms. Leslie Williams's cellphone, and began having a conversation with Mr. Harrison. Mr. Harrison explained to the behavior interventionist that the object was a toy BB gun.

22.

Notwithstanding the foregoing narrative, at the top of the Behavior Report, which, upon information and belief, will remain a part of Ka'Mauri's permanent school record, the Location of the Incident is described as "Classroom and Other" and the Nature of the Incident is falsely described as "13 Possesses Weapons Prohibited Under Federal Law."

23.

No federal law prohibits possession of a Daisy BB gun in a child's bedroom. However, Plaintiffs are unaware of any weapons prohibited under federal law when they are in the home.

24.

Although the JPS Expulsion/Change of Placement Protocol[8] instructs JPS employees "do NOT issue suspension for a specified number of days; this constitutes double jeopardy, which automatically violates the student's Due Process," Principal White did just that. In a blatant violation of JPS's policies and Ka'Mauri's rights, the Behavior Report states that Principal White took two actions:

> 09 002 Out of school suspension SUSPENSION BEGINS: 2020-09-16 STUDENT RETURNS 2020-09-29
>
> 29 001 Expulsion recommendation[9]

This document is signed by Principal White and dated September 14, 2020.

25.

JPS policies require a principal or her designee to "immediately meet with a student accused of serious misconduct," "provide a notice of the alleged misconduct[,] and give the student an opportunity to tell his/her side of the story." See Exhibit "B." Principal White violated this

---

[8] See Expulsion Change of Placement Protocol Sheet and District Affairs Sheet attached hereto and incorporated herein as Exhibit "B."
[9] See Expulsion Recommendation attached hereto and incorporated herein as Exhibit "C."

policy too: she never met with Ka'Mauri, nor did she ask to meet with Ka'Mauri on the date of the incident or prior to recommending him for expulsion. Indeed, no faculty spoke with Ka'Mauri until his expulsion hearing.

26.

On September 16, 2020, Mr. Harrison and Ms. Williams attended a meeting with Principal White whereby they were asked to submit a written statement from Ka'Mauri as to the incident, for the very first time. Mr. Harrison declined to submit such a statement because he did not feel it was appropriate for a nine-year-old boy to do so. Further, Mr. Harrison expressed his frustration with Defendants and what he perceived to be an egregious violation of his privacy rights and failure to inform parents regarding any policies on virtual instruction. Mr. Harrison was informed that events that took place in his own home were essentially the same as if those events took place on campus, in a government classroom.

27.

The family was given a "Woodmere School Expulsion Recommendation" ("Expulsion Recommendation") dated September 16, 2020.[10] It incorrectly states that Ka'Mauri is a female. The Expulsion Recommendation also incorrectly states Ka'Mauri would be suspended beginning September 16, 2020 -- although he was suspended effective September 11, 2020 -- and that he would remain suspended pending an expulsion hearing for "12 Possesses weapons prohibited under federal law." Upon information and belief, this Expulsion Recommendation document was given to Mr. Harrison on September 16, 2020, at a meeting that took place between Mr. Harrison and Principal White. A true and accurate copy of the Expulsion Recommendation Document is attached as Exhibit "C." Again, it cites that the expulsion is being recommended as a result of

---

[10] See Exhibit "C."

Ka'Mauri violating the "weapons in the classroom setting policy." To reiterate, the offense charged was possession of "weapons prohibited under federal law" despite the fact that Defendants knew and disputed that the purported "weapon" at issue was a toy, that Ka'Mauri was in his bedroom when the purported offense occurred, and it was never used or wielded in a threatening or dangerous manner.

28.

The Harrison-Williams Family did not receive the proper expulsion packet required by JPS's policies. They did not receive any "Due Process rights" document; they did not receive the Superintendent Expulsion Cover Sheet; they were not advised of the laws to be applied at a hearing; and they were not informed about three (3) witness statements until the family retained counsel who expressly asked the school for all information the Woodmere School planned to use at Ka'Mauri's Due Process Hearing. Indeed, one such document is signed and dated September 17, 2020, *i.e.*, after Mr. Harrison and Ms. Williams met with Principal White and Mr. Harrison objected to Woodmere School's violating the Harrison-Williams Family's rights.

Further, in the documents presented to the Harrison Williams Family, it is noted in Ka'Mauri's file that his father stated that he would come to the Due Process Hearing with "six on your side," to see what the media thinks about what happened to Ka'Mauri.

### THE HEARING

29.

On Monday September 21, 2020, at 10:08 a.m. with less than 24 hours notice Mr. Harrison was notified via text message that a "Grayson" was to have a Due Process Hearing the following day. At 10:17 a.m. Mr. Harrison received another text message -- this time with the Ka'Mauri's name – stating that Ka'Mauri's Due Process Hearing for his pending recommendation for

expulsion would take place on September 22, 2020, at 9:00 a.m. Nothing further was provided to Mr. Harrison. Again, Mr. Harrison did not receive a copy of the laws or procedures that would be used to conduct the hearing the following day, nor did he receive the witness statements, student file or Jefferson Parish Policies and Procedures at any point from Defendants.

30.

On Monday September 21, 2020, the Harrison-Williams Family's counsel called Christopher Durden, Administrative Assistant for Jefferson Parish Schools, and informed JPS that she would serve as Ka'Mauri's representative at the Due Process Hearing taking place the following morning. Mr. Durden stated that he would need to refer the issue to legal because an attorney was involved. Thereafter, Mr. Durden sent the Harrison-Williams Family's counsel a zoom link at 1:06 p.m. via email with Ms. Patricia Adams and copied Mr. Darvell Thomas thereto.

31.

On Monday September 21, 2020, the Harrison-Williams Family's counsel requested that she be provided with the same records that would be used at the hearing to better aide in Ka'Mauri's defense.

32.

JPS provided the Harrison-Williams Family's counsel with a copy of the Jefferson Parish "Procedures & Policies for Parents & Students" for 2019-2021 school year. An "Expulsion /Change of Placement Protocol" Flowchart was also provided. Again, this was the first time that the Harrison Family learned of any witness statements given by classmates or by the Behavior Interventionist, after he was entitled to the Pre-Expulsion packet.

33.

The information Defendants provided suggests JPS did not follow the statutory requirement for an annual review of disciplinary policies, hearing, and notice to parents and children of such policies. *See* La. R.S. 17:416.8.

34.

On September 21, 2020, after receiving "the only records that will be used in this case" and the policies/procedures JPS assured the Harrison-Williams Family's counsel that would be applied at the Due Process Hearing, their counsel recognized another gap in the documents sent to the Harrison-Williams Family. Harrison-William's Family Counsel emailed Ms. Patricia Adams (Senior Legal Counsel at JPS):

**Ms. Adams,**

**A cursory review of this material shows that this involves events occurring on school campus or at school events, etc. As this was a virtual learning event, have there been any policies or procedures put in place since COVID-19 by Jefferson Parish School Board that I should be aware of that Mr. Edwards did not attach?**

Ms. Adams did not respond. As such, the Harrison-Williams Family entered into the 2020 school year without any policies and procedures in place for the virtual learning school year or any policies regarding incidents that might occur in a student's home. Additionally, Defendants have not identified any policies or procedures, given to parents regarding "virtual classrooms." This is corroborated by the fact that the Jefferson Parish Policies for Parents and Students was written in 2019, and the Jefferson Parish Policies and Procedures for the Board regarding suspension and expulsion, which can be found online, were last updated in 2019.

35.

Next, after obtaining consent from Mr. Harrison, the Harrison-Williams Family's counsel received Ka'Mauri's file. The family learned for the first time that the Defendants had taken

witness statements from two children in Ka'Mauri's classroom. Had the Harrison-William's Family counsel not asked, the family would have never known about the witness statements JPS planned to use against Ka'Mauri at his Due Process Hearing.

36.

After reviewing the student file and the policies and procedures provided for the upcoming Due Process Hearing the following morning, the Harrison-Williams Family's counsel again reached out to JPS and requested their policies and procedures in place for Distance and/or Virtual Learning for the 2020-2021 School Year that would be applicable in this case. Shockingly, their counsel was essentially advised that no such policies existed and the Harrison-Williams Family had been given all of the policies and procedures that would apply in this hearing (this was not the case).

37.

Prior to the Hearing, undersigned counsel advised JPS that she would be submitting a Position Statement on Ka'Mauri's behalf. She was informed that the Position Statement could arrive by 8:30 a.m. the morning of the Due Process Hearing. A copy of the Position Statement is attached hereto as Exhibit "D."[11]

38.

The Due Process Hearing (the "Hearing") took place on September 22, 2020, at 9:00 a.m. Present at the Hearing was the Hearing Officer, Ms. Terri Joia; Principal White; Ka'Mauri's teacher, Ms. Leslie Williams; the Behavior Interventionist, Ms. Stacie Trepagnier; Ka'Mauri's father, Mr. Harrison; Ka'Mauri's mother, Ms. Thelma Williams; and undersigned counsel. Ka'Mauri was asked to give a statement at the Hearing, which he did, and which was consistent

---

[11] See Ka'Mauri's statement attached hereto and incorporated herein as Exhibit "D."

14

with the statement of his teacher, Ms. Leslie Williams, but he did not otherwise participate in the Hearing.

39.

Terry Joia ("Hearing Officer Joia") began the Hearing by stating "we are going to go over the due process procedure to ensure that all of the procedures were followed." Ka'Mauri's counsel immediately objected that Due Process in Ka'Mauri's case already had been denied. Thereafter, the Hearing took place as follows:

- Hearing Officer Joia asked if Ka'Mauri was made aware of the offense against him; the Harrison-Williams Family's counsel stated that it was because Ka'Mauri was charged with "possession of weapons prohibited under federal law."

- Hearing Officer Joia then asked if Ka'Mauri received written documentation of the action taken. The Harrison-Williams Family's counsel replied that the documentation and expulsion recommendation came from Principal White, and not Superintendent Gray as required by JPS policies and procedures. Counsel further stated that Ka'Mauri was not given the proper pre-expulsion packet required by JPS policies.

- Ka'Mauri's counsel reminded the Hearing Officer: "The event happened on the 11th, we are now at the 22nd and the child has not been allowed back at school and has been suspended since."

- Ka'Mauri's counsel stated that this simultaneous punishment in his pre-expulsion paperwork was a violation of Ka'Mauri's Due Process rights as set forth in JPS's procedures. Principal White admitted that this "was an error on our part." Ka'Mauri's counsel advised all Parties that this was more than just an error, it was a Due Process violation.

- Hearing Officer Joia then specifically asked, at the 7:50 minute marker, "***So he was given the rights with the notification that he would have the recommendation for appeal. The law.***"

- Hearing Officer Joia then proceeded with the hearing. Hearing Officer Joia opened with: "What we are looking at is really Jefferson Parish Policies … look at Revised Statute 17:416.1 and you look at the due process procedures as it is mandated in the law it is a little bit more rigid in Louisiana than what it is in the state guidelines."

- Next, Hearing Officer Joia stated that "The reason for the recommendation is for the possession of an unlawful firearm…during school activities." She then opined

15

that "when you are involved in a lesson online … it really is an extension of the classroom." When Ka'Mauri's counsel attempted to ask for policies and procedures to handle virtual learning, but was quickly cut off by Hearing Officer Joia who stated her conclusion that "look[ing] at the law and it really indicates there that it carries over from the physical building to any activity that is covered under the school grounds."

- Next, Hearing Officer Joia identified herself for the record as the designated hearing officer for the Superintendent and informed the Harrison Family that the hearing will be conducted pursuant to LSA R.S. 17:416 and 17:416.1. Hearing Officer Joia incorrectly stated: "You [were] provided a copy of these laws when you receive notice of a recommendation for expulsion."

- Regarding the incident itself, Ka'Mauri's teacher made clear that Ka'Mauri did not point the BB gun toward the screen, and that "it appeared that he was moving it from one spot to another" And Principal White conceded that "[a]s far as I know he told me it was not a rifle it was a BB gun something he allows in his home" and "the dad expressed the sentiment immediately that he felt this was being blown out of proportion because this was in the privacy of his home." Principal White then stated that she "consulted the district to find out what protocol I needed to take to address the situation and I was told by discipline that I should move forward with expulsion recommendation." Likewise, the Behavior Interventionist testified that Mr. Harrison "expressed concern about the whole situation, he felt again that this was an invasion of privacy," "he felt this was an invasion of privacy as it relates to virtual learning and the location of the room that his son was in," but that she had "explained to him that it was still considered a weapon[.]"

- Principal White testified that she "explained to [Mr. Harrison] that any replica of a gun in a school setting is an expulsion recommendation" … "even if a water gun is presented at school, we go through the same procedure, it is protocol." Ka'Mauri's counsel responded that her "main issue with this is not a weapon prohibited under law – I can't find anything that this is in internet policy – and I can't reconcile the fact that the due process protocol was not followed here."

- When asked to give a statement, and Mr. Harrison testified that he teaches his kids how to properly use the BB guns in the yard – he knows the difference between right and wrong – "it is very important to the family that this be dismissed, that it does not follow him in his educational career, and that the school did not follow his due process rights."

- Ka'Mauri's counsel again objected to the plethora of Due Process violations: "Ms. Joia I urge you to look at the fact that his Due Process rights were violated and if you find that it warrants a dismissal." "We have a due process violation so of course I am going to appeal it for violating his due process" … "If they have to hire me to appeal this matter, we are talking about extensive attorney fees." When Ka'Mauri's counsel questioned Hearing Officer Joia about the JPS policies and procedures

provided to her, Hearing Officer Joia stated "***that's apparently not correct what they have in the procedures.***" Ka'Mauri's counsel clarified: so **"basically we are facing Jefferson Parish policies and procedures contradicting Louisiana law?" Joia immediately responded "right"**

- Ka'Mauri's counsel explained: "[Y]ou do realize that y'all are submitting policies and procedures that are required to be submitted to the student prior to an expulsion recommendation that are inaccurate then" … "I am going to appeal it, I am going to bring it to the Superintendent[.]" "I am willing to appeal this and I really hope you consider that."

- Hearing Officer Joia then stated: "I'll send this to [Ms. Adams]… and so that way she can take a look at it." … "I'll send this to her and I'll have her take a look at it and **if she makes a recommendation I would be more than happy to follow it**." Hearing Officer Joia elaborated: "**I am going to send this to Ms. Adams so it may take a little bit longer, you do have a right to appeal within five (5) days.**"

At no point in this Hearing did Hearing Officer Joia disclose to the Harrison Williams Family that she had been the one to personally advise Principal White of what to charge Ka'Mauri with prior to his Due Process Hearing.

40.

Upon information and belief and in accordance with Hearing Officer Joia's statements, Ms. Adams was potentially one of the *de facto* decision-makers. She was not, however, present at Ka'Mauri's hearing.

41.

Multiple Due Process violations occurred at the hands of Defendants in the days leading up to Ka'Mauri's Due Process Hearing, and at the Due Process Hearing itself, and thereafter.

**KA'MAURI IS DENIED HIS RIGHT TO APPEAL**

42.

After the Hearing had closed, Ka'Mauri's counsel reached out to Ms. Adams to inform her of the multiple Due Process violations. Thereafter, Ms. Adams, directed Ka'Mauri's counsel to the

JPS website for yet another set of policies for the School Board with a direct reference to Section J Due Process. Shockingly, these policies were not provided to Ka'Mauri's counsel prior to the hearing despite repeated requests for the policies and procedures that would control the proceedings against Ka'Mauri.

43.

The very next day, on Wednesday, September 23, 2020, at 10:22 a.m., the Harrison Williams Family received the Hearing Officer's decision letter. The title of the email from Mr. Durden reads: "Hearing Officer's decision letter **on the recommendation of expulsion** for Ka Mauri Harrison from Woodmere School." The email attached a Hearing Officer Decision Letter dated September 22, 2020 (the same date of the hearing) and identified as "**Re: Hearing Officer Determination on Recommendation of Expulsion.**" The Hearing Officer Decision Letter is addressed to Ms. Thelma Williams and indicates that "based upon the evidence presented at the hearing conducted on September 22, 2020[12], it has been determined that [Ka'Mauri] is guilty of **displaying a facsimile weapon while receiving virtual instruction** from Woodmere Elementary School," *i.e.*, a *different* purported offense under JPS policies from the purported "possesses weapons prohibited under federal law" offense that the Harrison-Williams Family was notified would be at issue at the Hearing. The Hearing Officer Decision Letter then goes on to recite the "Jefferson Parish Public School Policy and Procedures 2019-21-Possession of a Starter Gun, Stun Gun, and/or Facsimile…"

---

[12] The amount of Due Process Ka'Mauri received in determining his guilt was a manner of hours, if not minutes as the letter is dated as the same date of the hearing itself. Notwithstanding the foregoing, the Harrison Family did not receive the decision until September 23, 2020, depriving the Minor Child of another day of education due to the Defendants' malicious delay.

44.

The Hearing Officer Decision Letter then goes on to recite JPS Policy for Teachers &
Parents (presumably created in 2019), to state that if any child is found guilty the following shall
occur: "students in kindergarten through grade (6) may be expelled from the school system unless
other corrective or disciplinary action is recommended by the superintendent or his/her designee."
**This is not the offense for which Ka'Mauri was provided notice and tried in his Due Process
Hearing.**

45.

The Hearing Officer Decision Letter then goes on to state that the "recommendation for
expulsion is to be amended to disciplinary action of six (6) days out of school suspension[13]… **and
a social work assessment**." Further, it should be noted that Ka'Mauri was not permitted receive
to virtual instruction on September 11; he received no formal education at all, not even homework
assignments, for nine days. Additionally, as of the date of the filing of this lawsuit, while Ka'Mauri
was receiving virtual instruction, but he had not been provided with a packet of any work that he
missed during his suspension.

46.

Upon receipt of the Hearing Officer Decision Letter, the Harrison-Williams Family's
counsel requested an appeal:

> This is a violation of Jefferson Parish's policies and procedures provided to me, as well as
> a violation of Ka Mauri's Due Process. A 6 day suspension [*sic*] for the rest of his schooling
> career, that he will have to report to colleges and universities will ruin this child's life. We
> want to immediately appeal this decision, and I would request a copy of the Hearing.

Ms. Adams responded less than forty minutes later:

> There is no right of appeal for a suspension. See La. R.S. 17:416.

---

[13] Was the Minor Child to remain out of his bedroom for a period of six (6) days?

47.

Contrary to Ms. Adams's response, La. R.S. 17:416 provides, in relevant part:

I(1) Upon **the recommendation by a principal for the expulsion of any student** as authorized by Subsection B hereof, a hearing shall be conducted by the superintendent or by any other person so designated to do so by the superintendent to determine the facts of the case and make a finding of whether or not the student is guilty of conduct warranting a recommendation of expulsion. Upon the conclusion of the hearing and upon a finding that the student is guilty of conduct warranting expulsion, the superintendent, or his designee, shall determine whether such student shall be expelled from the school system or if other corrective or disciplinary action shall be taken.

* * * *

(4) The parent or tutor of the pupil may, within five days after the decision is rendered, request the city or parish school board to review the findings of the superintendent or his designee at a time set by the school board; otherwise the decision of the superintendent shall be final. If requested, as herein provided, and after reviewing the findings of the superintendent or his designee, the school board may affirm, modify, or reverse the action previously taken.

(emphasis added). Likewise, the "Procedures and Policies for Parents and Students, given to the Harrison-William's Family in preparation for the Due Process Hearing stated that "[a] student **recommended for expulsion** shall have a right to a hearing and review by the School Board in accordance with Board Policy JDE."[14]

48.

On September 24, 2020, the Harrison-Williams Family's counsel emailed the members of the School Board and Ms. Adams, again requesting review of the Hearing Officer's decision, providing an analysis of La. R.S. 17:416, and noting that one of the School Board members had called her and informed her that had only recently been made aware of Ka'Mauri's plight via email.

---

[14] Pg. 11 of JPS Procedures and Policies for Parents and Teachers states this. There is a different set of policies and procedures to be applied by the Board, which can be found online.

49.

On September 25, 2020, Mr. Harrison emailed Tiffany Kuhn, President of the School

Board:

> Good Afternoon. My Attorney has requested on two occasions now that the School Board take my son's Decision under appeal. Will you, as the School Board President, please consider my 'son's suspension for an appeal.
>
> Thank you,
> Nyron Harrison

50.

On September 25, 2020, Ms. Adams replied on behalf of President Kuhn. The email read:

Ms. Cusimano:

As noted below, Ms. Kuhn asked me to respond to Mr. Harrison's request for Board review on her behalf.  I would ask that you communicate the following response to your client.

Mr. Harrison:

In response to your request to appeal your son's suspension to the School Board, Board President Tiffany Kuhn has asked me to provide an explanation as to why Ka'Ma'ri's suspension is not subject to review by the School Board.

Board Policy J–E - Expulsion - states that a parent may request Board review of the Superintendent's decision to expel a student.  Board Policy JDE reflects state law, which says that a student has a right to appeal an expulsion to the school board.

Board Policy J–D - Suspension - on the other hand, states that, with regard to a suspension, the decision of the Superintendent shall be final.  That is, there is no right of Board review when a student is suspended.  Again, the policy is consistent with state law which states that ", "The decision of the superintendent of schools on the merits of the case, as well as the term of the suspension, shall be final, . . ." ."
In other words, under Board Policy and state law, the decision of the Superintendent (or his designee, in this case, Ms. Joia) to suspend a student is final and there is no right of appeal to the School Board.

Because the School Board is bound to act in accordance with its own policies, the Board is not able to grant your request to review the Superintendent's decision in your son's case.

Ms. Adams's response was incorrect with respect to state law and the Procedures & Policies for Parents & Students given to the Harrison-Williams family, specifically with respect to the definition of "due process" on page 11 thereof. The policy, as written, recognizes the difference between a standard suspension and a "recommendation for expulsion."

51.

On September 29, 2020, the Attorney General of Louisiana issued a letter to BESE and the Superintendent regarding children "recommended for expulsion" based upon allegations of misconduct that occurred at their homes. The Attorney General explained that "the misreading of the plain text of the law by the Chief Legal Counsel for the Jefferson Parish School Board who has cited to Board policy as authority for superseding rights that are unambiguously provided in statute" is "wrong." A true and accurate copy of that letter is attached hereto as Exhibit "E."[15]

52.

On September 29, 2020, the Harrison-Williams Family's counsel and Mr. Harrison attached the Attorney General's Letter to an additional request that the School Board hear an appeal hearing for Ka'Mauri's suspension and the associated social work assessment. That request initially fell on deaf ears.

53.

Finally, on September 30, 2020, in one last effort to persuade Defendants to follow the law, the Harrison-Williams Family's counsel sent Ms. Adam and Ms. Kuhn a clip of the Hearing where Hearing Officer Joia advised the Harrison-Williams Family and their counsel that following the decision (which might be something other than expulsion) the family had five (5) days to appeal that decision. Shortly thereafter, Ms. Adams wrote back that Hearing Officer Joia "Ms. Joia is not

---

[15] See the Attorney General Letter attached hereto and incorporated herein as Exhibit "E."

an attorney," she "may have misstated the law," and "it would appear that [Attorney General] Landry made the same error." President Kuhn and Superintendent Gray were personally copied on Ms. Adams's email.

54.

Thereafter, in a last-ditch effort to avoid litigation, the Harrison-Williams Family's counsel responded to Ms. Adams, specifically identifying numerous statutory, procedural, and Due Process violations in the proceedings against Ka'Mauri. The School Board and Dr. Gray were copied on these emails notifying all parties of the due process violations. Ms. Adams respondedas follows:

> Quibbling about clerical errors in paperwork will not go very far when the student has received far more process than is due under such circumstances… Ka'Mauri received more than sufficient process to satisfy the requirements of the state and federal law.
>
> I cannot, and will not, recommend Board Review of Ka'Mauri's suspension, nor will I recommend expungement of his record because the facts are simply not as you have presented them in your similarly unprofessional efforts to litigate this matter in the press.

55.

Defendants failed to timely give Ka'Mauri the work that he missed and Ka'Mauri left Woodmere Elementary thereafter.

56.

The Harrison Williams Family filed a lawsuit on October 2, 2020, in the 24th Judicial District Court.

**THE KA'MAURI HARRISON ACT**

57.

Following the filing of the Petition on October 2, 2020, Representative Troy Romero submitted House Bill 83 into the 2020 Special Session already occurring at the Legislature.

58.

The following week House Bill 83 came before the House Education Committee. Ka'Mauri and Nyron Harrison testified before the House Education Committee about JPS's ongoing abuses and civil rights violations. After testimony was heard, the bill passed the House Education Committee unanimously.

59.

Thereafter, House Bill 83 came before the Senate Education Committee. Ka'Mauri testified at this committee, as did Mr. Harrison. Counsel for Defendants, Mr. Fred Preis, also testified at this committee and stated "Number one, and I know this is not the elephant in the room, this is not about race," this is not a gun case, and "this has a lot to do with . . . but not a lot to do with privacy . . . . Clearly none of us want people in our homes, but . . . *right now the home is considered on camera as part of the school system* . . . . So we tell our teachers to watch what goes on." Counsel for Defendants' counsel also testified that "it's a very good idea to send this back to BESE to get some guidance. *We didn't have anything* because we've been running around like crazy just trying to take care of the kids." Senator Kirk Talbot of Jefferson Parish tellingly responded: "**If you want guidance, clear [Ka'Mauri Harrison's] record**."

Defendants' counsel went on and further testified that this would have "absolutely no impact on these kids into the future." Senator Beth Mizzell responded: "it has had an incredible impact, this is nowhere for a 9 year-old to come plead his case, how incredible is that that we have reached the point where a child has to come up here and say please do something … this is just wrong. The idea that it will not affect his lifetime on your records, I guarantee you he is affected by this for his lifetime … I think it's easy to sit back in our roles and not be that 9 year-old … but

you all have an incredible amount of responsibility with your role with kids that are doing the best they can with this pandemic … I just beg to differ."

60.

Superintendent Wes Watts, as the President of the Louisiana Superintendent's association, and Superintendent of West Baton Rouge School, also stated that in West Baton Rouge Parish they are all for privacy in the home. Upon information and belief, after Senator Talbot introduced his amendments removing ordinary suspensions, Mr. Watts changed his card to "green" and voted in favor of House Bill 83.

61.

Despite vehement opposition from Defendants the bill passed the Senate unanimously with two conservative amendments proposed by Senator Kirk Talbot, a Senator for Jefferson Parish. These amendments took away the ability to have a school board hearing for COVID suspensions, and put a very strict attorney fee and damages provision into the law as well.

62.

On October 23, 2020, House Bill 83 passed the Louisiana Legislature, with unanimous bipartisan support in both chambers, and over ninety (90) co-authors.

63.

House Bill 83 does three things. First, it clarifies existing law, specifically, LSA R.S. 17:416(C)(4) & (5), to clarify that student's that were recommended for expulsion would receive a second level review. Even if this recommendation for expulsion is reduced to a suspension. Second, it adds attorney fees and damages for intentional or "grossly negligent" behavior by School Systems with regard to student discipline. Finally, it requires all School Boards to create virtual instruction policies prior to December 31, 2020.

MUSICAL CHARGES

64.

On October 27, 2020, Ka'Mauri received a letter from Superintendent Gray.  Dr. Gray stated that Ka'Mauri's record has been changed "to accurately reflect the facts of the case as learned…" and "the code will be changed to say … 14 Possesses weapons not federally prohibited." Ka'Mauri did not request that his record be changed; he has requested that it be expunged.

65.

Ka'Mauri received absolutely no notice from Defendants that they had any intent to change Ka'Mauri's "charge" to a new and different weapons charge for a second time. Ka'Mauri submits that while Superintendent Gray changed Ka'Mauri's weapons violation from possessing weapons federally prohibited to "14 Possesses weapons not federally prohibited," it is a weapon on campus violation nonetheless. Ka'Mauri received no notice of this new and different charge, and there was no due process hearing for this charge.

66.

This letter also indicates that Dr. Gray had the authority to unilaterally determine that no social work assessment would occur, and therefore, any injunction hearing already filed (three weeks prior) was now "moot." The Harrison Williams Family is uncertain as to this position taken by Superintendent Gray as to the authority to change records and remove "social work referrals," by a simple letter – as opposed to a new hearing or school board review - as Defendants consistently took the position that it was their policy and practice that the Superintendent's decision was "final."

**THE INTERIM VIRTUAL POLICY**

67.

On Monday, November 2, 2020, the Harrison Williams Family learned of a proposed "Interim Virtual Policy," which would be presented on the School Board Agenda on Wednesday, November 4, 2020. The Interim Virtual Discipline Policy is attached as Exhibit "F."

68.

When asked about how the School Board's Virtual Instruction Policy came to be, School Board attorney Mike Fanning stated that he did not know, as he did not write it. Mr. Fanning sated, **Ms. Adams did together with outside counsel in one of the pending litigations against the School Board**.

69.

This Interim Policy states that "[s]tudent conduct is governed, at all times and regardless of the model of instruction, by La. R.S. 17:416…" Further, the Interim Policy, which is a three-page document, stated that "[s]tudents and parents, typically, have a reasonable expectation of privacy with regard to what takes place in their home outside of the view of teachers and peers in the virtual classroom."

70.

The Interim Policy then identifies a number of ways by which a student can be disciplined pursuant to La. R.S. 17:416 for actions taking place in their home. With regard to the "handling or displaying of weapons, including toy or facsimile weapons," the Jefferson Parish School Board Interim Policy requires that these incidents must be immediately reported to the determine "whether the matter must be reported to local law enforcement and/or the Department of Children and Family Services."

71.

The signature page for the Policy is titled an "Acknowledgement," but the signature page does more than acknowledge the policy, it has a space for parents to sign the following:

> We understand and agree that _____ [name of student] will be held accountable for complying with the discipline rules and may be subject to disciplinary action in accordance with the student code of conduct and the Interim Virtual Discipline Policy for violations thereof.

The "Acknowledgement" then has a place for the student to sign and for the parent to sign.

72.

On November 4, 2020, a School Board Hearing was held. The Virtual Interim Policy was on the Agenda.  When the Interim Policy came up for discussion, Board Member, Mark Morgan, asked for input from the Jefferson Parish School Board attorneys. The attorney for the School Board went to the table and shockingly stated: "I did not prepare this, this was done by Ms. Adams … she prepared it with one of the attorneys handling one of the lawsuits against us… so I would have to defer to her."

73.

Further, on November 4, 2020, Civil Rights Attorney Victor Jones and Deputy Solicitor General Scott St. John spoke to the Board as to the unconstitutional nature of the new Interim Policy. Specifically, it was stated that the policy's foundation was invalid, that the policy was unconstitutionally vague, and it was not "narrowly tailored" to suit a compelling government interest as required by House Bill 83.  When Deputy Solicitor St. John referenced H.B. 83 by it's title – the Ka'Mauri Harrison Act --  A School Board Member became visibly angry, agitated, and falsely stated that he could not talk about Ka'Mauri as they were more or less "gagged" by the Harrison Williams Family. Prior to that point, Deputy Solicitor St. John had made no reference to

Ka'Mauri's case. The Board member's response suggested he was entirely tuned out to the comments provided by a senior attorney speaking on behalf of the Attorney General.

74.

Despite the opposition, the School Board passed the Interim Policy on November 4, 2020, which would potentially require the Harrison Williams Family to sign five (5) copies of this policy, based on the language on the signature page.

75.

Later that evening, still very upset about what the Board Member stated and how he reacted at the School Board Meeting, Mr. Harrison reached out to the Board Member, who he did not sue personally, in an e-mail titled "You Had My Consent." Mr. Harrison e-mailed:

> "Good evening Mr. dale. My name is Nyron Harrison, and I am the father of Ka'Mauri, I heard your testimony tonight and wanted to let you know that Ka Mauri's mother and I signed a waiver and it was given to your lawyers well in advance of this hearing. I'm sorry if your lawyers kept that from you but you have my consent to discuss the facts regarding my sons case"
>
> Nyron Harrison

The Board Member responded: "No sir. Please direct any communication to our lawyers, not me."

Mr. Harrison apologized to his elected official and informed him that he wanted him to have the facts correct, and that the lawsuit did not name him individually.

76.

On November 5, 2020, Governor John Bell Edwards signed House Bill 83 into law.

77.

On November 6, 2020, through counsel, the Harrison Williams Family **again** asked Defendants for a right to an appeal of the Incident.

78.

The Harrison Williams Family received no response to this request for appeal.

79.

By letter dated, November 11, 2020, the Harrison Williams Family again, through counsel, requested an appeal. The Harrison Williams Family did not receive a response to this letter either.

80.

On November 17, 2020, the Harrison Williams Family learned that Defendant School Board had convened a special session to "challenge the constitutionality of Act 48 of the 2012 Special Session." Noting that 2012 did not have a special session and the unlikely nature of a challenge to Act 48 of the 2012 Regular Session regarding the transfer of state land to the City of Eunice, counsel for the Harrison Williams Family notified Defendants' counsel and requested the School Board not take up the item, lest the Defendants violate the Open Meetings Law.

The Harrison Williams Family, through counsel, also notified Defendant School Board, through counsel that it would like to be heard whether or not Ka'Mauri would be given an appeal hearing at this session.

81.

On November 18, 2020, the special session convened, and after nearly a one hour closed door Executive Session, the Board came back to the session and clarified their error, performed a "first reading" of the Motion to Authorize potential litigation to challenge the constitutionality of the statute, and stated that it would take this motion up at its next hearing on December 2, 2020.

82.

Notwithstanding the foregoing, at the special session, Senator Kirk Talbot addressed the School Board and asked the School Board to **please consider** not challenging the constitutionality

of House Bill 83. Senator Talbot informed the Board that the Chairman of the House Education Committee, Ray Garafalo, was an attorney who looked at the bill. Senator Talbot notified the Board that the Chairman of the Senate Education Committee, Cleo Fields, was an attorney that looked at the bill. Finally, Senator Talbot informed the board that Executive Counsel for Governor Edwards, Matt Block, looked at the bill, and all three attorneys had felt the bill was constitutional. Senator Talbot informed the Board, and its attorneys, that the Legislature was filled with attorneys who looked at the bill, and all of them agreed that it was constitutional.

## KA'MAURI IS GIVEN A SHAM-APPEAL

83.

Finally, on November 18, 2020, for the first time since September 24, 2020, Defendants Counsel notified the Harrison Williams Family, through counsel, that Mike Fanning, the attorney for the board, would choose a date for an appeal, and notify the Harrison Williams Family, of counsel, of same.

84.

On Monday November 30, 2020, the Harrison Williams Family was finally advised that a hearing before the Jefferson Parish School Board had been set for December 4, 2020, at 9:00 a.m. No instruction or policy came with this notification.

85.

The Harrison Williams Family asked for policy for this School Board Hearing and was informed: "there is no school district policy on the hearing." The Harrison Williams Family was told that this was the first time the School Board would be conducting a hearing like this.

86.

The Harrison Williams Family was simply told that Ms. Adams, a Defendant in this litigation, would be presenting the Superintendent's case to the School Board for review, and that the Harrison Williams Family could call witnesses, have an opening and closing statement, and present evidence. The Harrison Williams Family was also notified that School Board member Mark Morgan was an attorney, and he would preside over the Hearing. The Harrison Williams Family immediately objected to Ms. Adams conducting the Hearing.

87.

On Tuesday December 1, 2020, the Harrison Williams Family was notified that they needed to submit their exhibit and witness lists to Counsel for the Superintendent by 5:00 p.m., and that this request had come from School Board President, Tiffany Kuhn.

88.

The Harrison Williams Family counsel sent notice to School Board attorney, Mike Fanning, and Ms. Adams of its intent to call Ms. Adams as a fact witness. The Harrison Williams Family counsel also again informed Ms. Adams and Mr. Fanning that the Harrison Williams Family had substantial concerns with Ms. Adams presenting the case to the School Board for review. Neither Ms. Adams nor attorney Mike Fanning responded.

89.

On December 4, 2020, at 9:00 a.m. a School Board Hearing took place at the Jefferson Parish School system headquarters in Jefferson Parish, Louisiana.  This School Board Hearing was an item on a School Board agenda issued earlier in the week in the format of a "special session."

90.

The Hearing was biased and humiliating and it became apparent from very early on that Ka'Mauri was not going to be given a fair hearing. The presiding board member actually forgot the children in the hallway after the hearing commenced.

91.

Ms. Adams, as Counsel for the Superintendent, was allowed to "present the Superintendent's case," despite the Harrison Williams Family objection and despite the fact that Mr. Morgan stated she was the "attorney for the Board."

92.

Prior to the Hearing, an issue arose between the media and the School Board. Specifically, there were signs on the doors that no cameras or recordings would be allowed in the board meeting that was holding this Hearing. Mr. Scott Sternberg, an attorney acting on behalf of the media, stated that this was an open meeting. Ms. Adams stated to the School Board that it needed to remain closed because there were several witnesses that had received "threats" in this case. When asked if Ms. Adams could produce to the School Board these threats, Ms. Adams claimed she had **"deleted"** them and did not keep them. The School Board ultimately relented when the media agreed not to record images of certain witnesses.

93.

At some point, when discussing witnesses, the Harrison Williams Family counsel informed Mr. Morgan of the Harrison Williams Family's intent to call Ms. Adams as a witness. Mr. Morgan stated: "Why is Ms. Adams being called as a witness. She is an attorney for the Board."

94.

Ms. Adams gave an opening statement to the Board, as its "attorney," and gave the Board legal advice throughout the entirety of her statement. Ms. Adams also extensively discussed the policies and procedures "established," in her opening statement.

The Harrison Williams Family had previously, on numerous occasions, objected to Ms. Adams being the party to introduce the case to the School Board for these exact reasons. These concerns were ignored.

95.

Ms. Adams called four witnesses at the Hearing: Ms. Germaine Gilson, Principal White, Ms. Leslie Williams, and Hearing Officer Joia.

96.

Upon information and belief, Ms. Gilson is the Chief Affairs Officer for the Jefferson Parish School System, and until December 4, 2020, the Harrison Williams Family had no knowledge of her role in this case.

97.

Nonetheless, Ms. Gilson provided no factual testimony; she instead testified that she had reviewed the file and that "no due process violation had occurred."

98.

Ms. Gilson then testified that it was her belief that Ka'Mauri had met with his Principal, Principal White, prior to the expulsion recommendation. This was not the case. The Harrison Williams Family had never heard of Ms. Gilson prior to the date they were notified that she would be appearing as a witness.

99.

Ms. Gilson was then given a free pass to discuss any and every incident that would be treated the same virtually as it would be in a brick and mortar school. Ms. Gilson was asked on several occasions to opine about "disruption," and what offenses would be treated the same virtually as they would in a classroom. Ms. Gilson was asked to opine about "due process."

On cross-examination, the moment Harrison Williams Family attempted to entertain this same line of reasoning – by asking if a student would be recommended for expulsion if prescription medication was on the counter of the virtual screen – Counsel was immediately shut down and that line of questioning **was not allowed**.

This was a theme throughout the entirety of the Hearing. Allow the witnesses for the Superintendent to have free range of discussion and discuss legal theories and conclusions – then ban and cut off the testimony of the witnesses of the Harrison Williams Family, including Mr. Harrison himself.

100.

The Harrison Williams Family were in possession of several documents of the Jefferson Parish School System, including the following: notification of rights pursuant to LSA R.S. 17:416, pre-expulsion due process, pre-suspension due process, and the pre-expulsion flow chart. When asked about these documents, Ms. Gilson testified that these documents were "internal," and guidance for administrative purposes only. And when asked why there was space for parent's signatures on these documents, Ms. Gilson testified that signatures "were not required."

Ms. Gilson testified that these documents were "a nice second assurance that a parent has it."

Harrison Williams Family counsel directly pointed out that the School System was "picking and choosing which policies will apply to virtual students and which ones will not apply

to virtual students." Ms. Gilson disagreed, despite this having been proven with the Due Process principal/student meeting that is "policy," but did not occur in this case.

101.

At the end of Ms. Gilson's testimony, another School Board Member took it upon himself to tell the Board and Ms. Gilson that Ms. Gilson "was pretty much the expert in this District on this…"

102.

The Superintendent's next witness was Ka'Mauri's teacher, Ms. Leslie Williams. Ms. Leslie Williams testimony was very upsetting to the Harrison Williams Family and caused them a great deal of distress and humiliation. While Ms. Leslie Williams had defended Ka'Mauri at the Hearing Officer Due Process Hearing on September 22, 2020, Ms. Williams was now taking an entirely different tone. Ms. Williams, for the first time, and out of nowhere, tried to poke holes in Ka'Mauri's story that he was moving a BB gun. Ms. Williams then testified: "Ka'Mauri likes to shine." *Cf. Fuller v. Shearin*, 2015 WL 1268168, at *3 n.2 (D. Md. Mar. 17, 2015) ("The Court takes judicial notice of the fact that 'shine' is a racially offensive term used in a derogatory manner to refer to members of the African American race.").

Ms. Williams stated: **"[A]nd I use the urban terminology shine because that is what he understands and that his what is dad understood when I told him that."**

This testimony was not only unnecessary and false, it shocked Mr. Harrison and Ka'Mauri and caused a great deal of harm to them. Both Ka'Mauri and Mr. Harrison know how to have a discussion that is not "urban." Ms. Williams did not make a single statement about Ka'Mauri trying to "shine" at his pre-expulsion Due Process Hearing when asked the exact same thing about what kind of student Ka'Mauri was. This repulsive statement was the first time any testimony was heard

36

as to Ka'Mauri liking to "shine." Ms. Williams further tried to paint Ka'Mauri in a negative light, bringing up the fact that he had brought a "fluffy white dog," into the screen one day when Ms. Williams was talking to Ka'Mauri's mom.

The testimony of Ms. Williams was horrifying and the Harrison Williams Family are still entirely uncertain as to how the School Board allowed Ms. Williams to talk about Ka'Mauri the way that she did – when there was no factual dispute that Ka'Mauri was taking a test on mute and that Ms. Williams could not see anything other than a close-up of Ka'Mauri.

103.

On cross-examination, Ms. Williams admitted under oath that Ka'Mauri was a good student. Ms. Williams testified on cross-examination that Ka'Mauri had been out of his seat for a matter of seconds, and when he returned to his seat he immediately went back to taking his test. Ms. Williams testified that Ka'Mauri did not say anything, and she did not understand how he could have said anything as he was taking a test on mute. Ms. Williams testified that Ka'Mauri had not threatened anyone.

104.

Ms. Williams also testified that she had gotten in touch with Ka'Mauri's mother very shortly after the incident, who informed Ms. Williams that "it was a BB gun."

105.

On cross-examination Ms. Williams agreed that it was her behavior that also distracted the classroom, as she was yelling at Ka'Mauri who was muted taking his test.

106.

Ms. Williams tried to suggest that there was no brother in the room, but on cross-examination admitted that she only had a close-up of Ka'Mauri, that he was on mute, and she would have actually had no possible way to see or hear who else was in the room: **"there would have been no way for me to see."**

Ms. White testified "she did not even know why Ka'Mauri got up" from his chair, but that he was only gone for "probably seconds." Ms. Williams could not plausibly explain why or how she indicated that Ka'Mauri was "shining" by having a BB gun visible in the screen while taking a test on mute.

107.

When counsel tried to question Ms. Williams about whether or not she had seen a rifle or a BB gun, Mr. Morgan interrupted the questioning and stated: "it doesn't make a difference under the policy." The Harrison Williams Family submits that it does – and even the coding is different on the two.

108.

The Superintendent's next witness was Principal White. Principal White was asked what happened upon learning of the Incident. Ms. White testified that she immediately called the District, and spoke with Hearing Officer Joia. She stated that it was Hearing Officer Joia that had informed her to move forward with an expulsion recommendation.

Hearing Officer Joia never disclosed her bias and lack of neutrality at his pre-expulsion Due Process Hearing. Had she, the Harrison Williams Family would have immediately asked for a new hearing officer, as it was clear that Hearing Officer Joia was not an "impartial" decision maker – having previously given advice to Principal White about this incident. On cross-examination, Principal White confirmed nothing in the entire file indicated that Ka'Mauri did

anything other than move a BB gun. Principal White also testified that she did not have a principal student meeting prior to writing Ka'Mauri up for "possesses weapons federally prohibited," nor did she request that Ka'Mauri have a meeting with her prior to writing up his expulsion recommendation.

109.

Principal White testified that at the time she was trying to get in touch with Ka'Mauri's parents – she was going to contact a resource officer – but it became unnecessary "because we got the parent on the phone and at that point we were able to confirm that the child had a BB gun and the parent was aware of it." Principal White further testified that when she spoke to the parents, "It did not seem that they were aware of what happened when we spoke to them…"

Principal White did not ask to speak with Ka'Mauri that day or ever ask for his version of events.

110.

Principal White never testified about law enforcement involvement, as there was absolutely no law enforcement involvement in this case.

111.

Principal White also testified: "I did not specifically request a meeting with Ka'Mauri." Principal White further testified that she did not give the Harrison Williams Family their notice of rights pursuant to LSA R.S. 17:416, or "due process" rights.

112.

Principal White was then allowed to opine about the difference between virtual instruction discipline and classroom discipline and how "there was none." Principal White was asked to explain the difference in various forms of discipline in the virtual classroom versus in a classroom

(despite the fact that Harrison Williams Family counsel was completely cut off when this theory was explored on the other end).

113.

Hearing Officer Joia testified next. She testified that her role was to be an impartial decision maker. Directly contradicting Principal White, Hearing Officer Joia falsely testified she never spoke to anyone about the facts of this Incident before the Due Process Hearing.

Hearing Officer Joia then testified that she was the "impartial decision maker" on this case. When asked if she informed the Harrison-Williams Family of her advice in Ka'Mauri's case, Hearing Officer Joia replied only that she "didn't know" which student it was.

Hearing Officer Joia testified that she sent the decision to her supervisor and Ms. Adams for review, based upon Harrison Williams Family counsel request to do so. She further testified that she sent her decision letter to administration prior to sending her decision letter to the Harrison Williams Family.  She testified that this is "why" Ka-Mauri received a six-day suspension.

114.

When asked where Ka'Mauri's notification of rights pursuant to LSA R.S. 17:416 were, Joia testified that the file comes in many pieces, and she admitted that a notification of these rights was required for due process in her training. Hearing Officer Joia testified that had she known he had not received the notice of rights, her decision at to procedural due process might have been different.

115.

All of the witnesses took the position that it was the "policy" to apply LSA R.S. 17:416 to the virtual instruction environment – and that this "policy" had been established prior to the Incident.

116.

Ka'Mauri intended to call the following witnesses who were not already on the witness list for the Superintendent: Ka'Mauri, Nyron Harrison, Patricia Adams, and Louisiana Solicitor General Liz Murrill, and Superintendent Gray. Ka'Mauri had sent his witness list to the School Board two days prior to the Hearing. Superintendent Gray did not show up to the hearing, and was not in the building when Ka'Mauri attempted to call him first.

117.

Ka'Mauri testified to the fact that he was taking a test on mute, and his brother tripped over the BB gun, and he moved it to the right side of him – and went back to taking his test.

118.

Mr. Harrison testified as to his recitation of events that day – and that upon speaking with the school he was immediately notified that his son was facing expulsion for a weapon on campus violation.

119.

It was clear that the School Board was unable to be impartial to Mr. Harrison and that they had a bias. In the middle of Mr. Harrison testifying about the incident, Board Member Simeon Dickerson stopped Mr. Harrison's testimony and asked him: did you ever consider how the teacher felt?

Nevertheless, when Harrison Williams Family counsel tried to ask Mr. Harrison how **he** felt, Ms. Adams interrupted and said that counsel was trying to create a record for the lawsuit.

120.

When asked why Mr. Harrison never gave a statement of Ka'Mauri prior to the Due Process Hearing, Mr. Harrison informed the School Board that he did not trust what was happening, as he

was being told that this was just "protocol," but the documents being presented to him said something exceptionally serious. Mr. Harrison stated that from the moment he spoke to the principal, and then saw the documents in front of him, he felt that he needed representation. Mr. Harrison testified that no one ever asked to speak with Ka'Mauri until the pre-expulsion meeting itself. At that point, Mr. Harrison was no longer interested in providing a statement as he could read that his son was being recommended for expulsion for "possesses weapons federally prohibited."

121.

Mr. Morgan stated that it was "reasonable" for Mr. Harrison to not have trusted the system – yet later presumably backed off of this position in delivering the School Board decision.

122.

Next, Ka'Mauri attempted to call Solicitor General, Liz Murrill.  Although the School Board had repeatedly received legal advice from Defendant Adams, it blocked Ka'Mauri's ability call Solicitor General Murrill. Indeed, presiding officer and School Board member Mark Morgan responded that the Department of Justice's involvement in these cases was "shameful."

123.

During the hearing, the Harrison Williams Family informed the School Board of the numerous procedural due process rights violated in this case, pursuant to JPS own policies and procedures for "Due Process," in addition to those addressed before the Hearing Officer and in the lawsuit. The Harrison Williams Family also informed the School Board that this was the position of the family from the moment the Harrison Williams Family participated in the Due Process Hearing. The Harrison Williams Family counsel expressly listed those violations for the Board's consideration.

124.

The Board went to the Board Room for approximately less than thirty minutes and returned and determined to uphold Ka'Mauri's weapons possession charge – but to reduce his suspension to three days (presumably to match that of another student). School Board member Mark Morgan declared that due process was followed, but "just barely."   Mr. Morgan also stated that to the extent Ka'Mauri was entitled to Due Process, his father "interfered with it" by not providing a statement from Ka'Mauri. Morgan also voluntarily opined that Ka'Mauri's testimony appeared to be "coached."

125.

In short, after a very disheartening six-to-seven hour hearing, and after being blocked at every angle by the Superintendent and the School Board to adequately present their case, the Harrison Williams Family left the Jefferson Parish School Board with a disciplinary infraction for a "weapons on campus violation" not expunged from Ka'Mauri's school records, for an incident that occurred in his bedroom of his home.

**Jefferson Parish School Board's Pattern of Due Process Violations**

126.

On October 13, 2020, a Freedom of Information Act ("FOIA") request was sent to the Department of Education by Harrison Williams Family counsel requesting the following:

> Any and All Department of Education records, documents, communications, investigation documents, investigational findings, litigation paperwork, or department memoranda concerning an investigation and or lawsuit against the Jefferson Parish Public School Systems and Jefferson Parish School Board., for violations of and statutorily protected rights, violations of State Constitutional Rights, and/or violations of rights protected by the United States Constitution.

127.

The Department of Education responded that the request needed to be narrowed due to the amount of Complaints in its possession, as there were more than one hundred complaints against the Jefferson Parish School System. Notwithstanding the foregoing, the DOE FOIA counsel informed Brown Family counsel that the Jefferson Parish School System had entered into approximately sixteen (16) Office of Civil Rights Agreements, with nine (9) having been entered into in the past ten years - approximately one OCR Agreement a year.

128.

The Harrison Williams Family submits that it is the pattern and practice of the Jefferson Parish School Board to engage in actions that amount to violations of student's civil rights.

**Jefferson Parish School Board Member Clay Moise Defames Ka'Mauri**

129.

On December 10, 2020, a concerned citizen, Ricky Modessit, with no relation to the Harrison Williams Family, wrote to the Jefferson Parish School Board about the facts of Ka'Mauri Harrison's case. Mr. Modessit, among other things, stated: "I have read through all of the media reports and find your actions to be simply unbelievable."

Mr. Modessit forwarded this communication to Harrison Williams Family counsel. Jefferson Parish School Board Member, Clay Moise, wrote to a member of the public the following false, malicious, and retaliatory statements:

> "Thank you for your impassioned email. Given the status of media today, I can understand that you would deem the Board's action unbelievable. However, the media reports that you have relied on are not comprehensive and in some cases are not factual. As such, you have made a judgment with only one rendition of the "facts", as did our legislature…. Besides the teacher, there were a number of other witnesses to the event. ***There was no brother in the room. In fact, the student disappeared from view and returned with the gun in his hand. A gun, by the way, that looked like an authentic rifle… The student had incoming audio silenced our*** administration was unable to contact either parent for an extended period of time and **we had to call the local police** to conduct a welfare check. All of this was of major concern to the teacher, disruptive

to the class and school administration, and **an unnecessary distraction for law enforcement**… I appeal to you to consider that our media is no longer unbiased reporting of the news, but almost all editorial in nature. If you can provide your phone number, I would be happy to share additional facts."

Respectfully,

Clay Moise
Bejamin C. (Clay) Moise, II
Board Member, District IV
Jefferson Parish Public School System
….
Clay.moise@jps.schools.org.

130.

There was not one person that testified at the School Board Hearing that witnessed the event other than Ka'Mauri's teacher, Ms. Leslie Williams. Ms. Williams testified that she would have no way to tell if Ka'Mauri's brother was in the room or not.  Not one person testified about law enforcement involvement or an unnecessary disruption to law enforcement. In fact, law enforcement was never involved in this case.

131.

When Ms. Williams tried to poke holes in Ka'Mauri's story about his brother being in the room, Ms. Williams testified that she could only see Ka'Mauri and his close-up screen and could not see any other part of his bedroom, other than Ka'Mauri directly on screen taking a test. Ms. Williams testified he was out of his seat for a matter of seconds and came back and moved the BB gun across the screen and set it by his side. Ms. Williams testified that incoming and outgoing audio was muted, as Ka'Mauri was taking a test.

132.

On December 11, 2020, Mr. Moise sent yet another defamatory email that was forwarded to the Harrison Williams Family counsel. This time, Mr. Moise stated the following:

I can tell you with absolute certainty (at least on my part) that if the family and young Ka'Mauri had given a statement as requested by the administration on the day of the event, you would have never heard of this.  Instead, the family retained an attorney.  This attorney chose to use this child and his family to create an activist media frenzy and prohibit the school system from telling the whole story.  It is the attorney that bears the responsibility for encumbering this child with the negative notoriety.

As to the punishment, the parents acknowledged that they were aware of the regulations related to weapons (even facsimile weapons) and virtual learning. Actions have consequences.  I would point out that the Board did choose to reduce the suspension from six (6) to three (3) days.  This suspension is considered a minor offence and will in no way affect the young man's academic pursuits.

133.

The Harrison Williams Family never acknowledged that they were aware of the regulations related to weapons and virtual learning. In fact, they stated just the opposite. No one testified that Ka'Mauri was asked to give a statement on the day of the event, **as he was not**. Finally, a weapons on campus charge is certainly not a "minor offense."

134.

Harrison Williams Family counsel has also been forwarded responses to constituents by Board President Tiffany Kuhn, and two other Board Members.

135.

On December 11, 2020, the Harrison Williams Family sent Defendants a litigation hold letter to Defendants' counsel, as a result of Ms. Adams testimony that she had "deleted" emails from the public – and the Harrison Williams Family knowledge of the kinds of statements being sent by Defendants, such as Mr. Moise's two emails.

## CLAIMS FOR RELIEF

### COUNT I

**Judicial Review Pursuant to LSA R.S. 17:416 (C)(4)**

I.

Plaintiffs reassert the allegations of 1 through 135 of the Complaint, and all of the allegations of the First Amending and Supplemental Complaint.[16]

II.

La. R.S. 17:416 was applied by the Hearing Officer and is applicable to the proceedings against Ka'Mauri. La. R.S. 17:416(C)(4) imposes upon the School Board a nondiscretionary duty to "affirm, modify, or reverse" the findings of the Superintendent or his designee if requested to do so by the parent or tutor of the pupil. Ka'Mauri's parents have so-requested.

III.

The School Board refused to perform its non-discretionary duty to review, for a period of approximately ten weeks.

IV.

The School Board (at the time of filing the original Complaint) implicitly affirmed the findings of the Superintendent or his designee, such that Ka'Mauri's parents "may, within ten days, appeal to the district court for the parish in which the student's school is located, an adverse ruling of the school board in upholding the action of the superintendent or his designee." La. R.S. 17:416(C)(5). Ka'Mauri timely filed a Petition for Judicial Review. In accordance with the statute, La. R.S. 17:416(C)(5), the Harrison-Williams Family so appeals and requests that this Court review and reverse the action of Superintendent Gray and Hearing Officer Joia, pursuant to the

---

[16] Modified from Original Complaint.

plain language of LSA R.S. 17:416(C)(5) as written at the time Ka'Mauri requested judicial review.

V.

Ka'Mauri submits that it was always his right for judicial review, pursuant to LSA R.S. 17:416(C)(5), and asserts that right herein. Ka'Mauri does not seek to waive his original Petition for Alternative Judicial Review or waive any due process violations for the failure to conduct a School Board hearing timely.

**COUNT II**

**Petition for Judicial Review Pursuant
to LSA R.S. 17:416 (K), Section 2(B) in Act 48**

I.

Plaintiffs reassert the allegations of 1 through 132 of the Complaint, and all of the allegations of the First Amending and Supplemental Complaint.

II.

Ka'Mauri has always been entitled to Judicial Review pursuant to LSA R.S. 17:416(C)(5), and timely requested such review.

III.

Alternatively, and/or simultaneously, Ka'Mauri requests that this Court perform judicial review of the discipline decision of the School Board pursuant to LSA R.S. 17:416(C)(5) and LSA R.S. 17: 416(K), Section 2(b) and (c).

IV.

On December 4, 2020, the School Board held a fundamentally unfair hearing, with no policy or procedure in place to conduct same, and after blocking testimony and witnesses presented by the Harrison Williams Family, concluded that due process had been met, but "just barely." The

School Board determined that Ka'Mauri's weapons on campus violation would remain on his record, but his suspension would be reduced from six days to three days. Undoubtedly this was the result of the School Board pre-determining that Ka'Mauri's discipline needed to match that of another student, Tomie.

Ka'Mauri submits that Due Process was not met at any point leading up to the Hearing on December 2, 2020, nor was it had at the Hearing on December 2, 2020.

V.

In performing the aforementioned review, this Honorable Court may "determine whether the student shall be cleared of the charge, whether any other conditions placed on the student shall be removed, or if the student is eligible for any other relevant relief."

VI.

Plaintiffs are entitled to reasonable attorney fees, if this Court so funds on Judicial Review.

VII.

Plaintiffs are entitled to damages and an apology letter to Ka'Mauri as provided for by the Statute.

**Count III**
**42 U.S.C. § 1983 and State and Federal Constitutional Procedural Due Process Claims**
**(Ka'Mauri Against All Defendants[17])**

1.

Plaintiffs reassert the allegations of facts set forth hereinabove in Paragraphs 1 through 132. Count III is alleged against each defendant, in his or her individual and official capacities, and collectively, as stated herein.

---

[17] To the extent actual actions are against specific Defendants, Ka'Mauri will identify those individuals and each action to best of his ability.

2.

Ka'Mauri has a right to Procedural Due Process pursuant to the State Constitution and Federal Constitution. Ka'Mauri has a right to public education, all Defendants deprived him of this right, and this deprivation was effected without due process, as stated more fully herein.

3.

All Defendants violated Ka'Mauri's rights to Procedural Due Process while acting under color of state law, individually and collectively. All Defendants also acted in their individual capacity. All Defendants had personal involvement in the actions amounting to Constitutional Violations and knew about the conduct, failed to rectify it, facilitated it, and/or turned a blind eye. From the moment that Mr. Harrison learned that his son was facing expulsion, he began to notify every party involved that his constitutional rights were being violated. This is well documented.

4.

Defendants are liable to Ka'Mauri for all Defendants' violation of Ka Mauri's rights to Procedural Due Process because the unconstitutional actions of Defendants were encouraged, approved, caused by, tolerated, permitted or ratified by established customs, policies, practices, or procedures established by the Jefferson Parish School Board, and all Defendants, including but not limited to the following procedural violations.

Further, the actions of all Defendants, as stated throughout this Complaint, are obviously so wrong that all "reasonable officials" should have known that Ka'Mauri's due process rights were being violated.

5.

All Defendants subjected Ka'Mauri to a fundamentally unfair process from September 11, 2020, until the date of the School Board Hearing on December 4, 2020.

6.

Defendants, Superintendent and School Board, failed to issue policies and procedures that gave adequate notice of conduct that would subject Ka'Mauri to discipline. Defendants, Superintendent and School Board, also failed to create directives understandable to the average student or to parents.

7.

Defendants, Ms. Adams and Superintendent Gray, failed to follow the policies and procedures that they did issue to the Harrison-Williams Family on the day before his Due Process Hearing. Specifically, Ka'Mauri was given a pre-expulsion flow-chart and the policies and procedures for parents and students for 2019-2020. The Harrison Williams Family requested policies and procedures for virtual learning and were advised that they had everything. The next day, following the hearing, Harrison Williams Family counsel advised Ms. Adams personally of the multiple due process violations that had occurred at the Hearing – Ms. Adams then, for the first time, sent the Jefferson Parish School Board policies and procedures.

8.

Defendants, Hearing Officer Joia and Superintendent Gray, purported to change their policies at the Hearing without proper notice.

9.

All Defendants inconsistently applied School policy and Board policy and State law, and applied State law in a manner that is inconsistent with state law and procedures.

10.

Defendants, Superintendent Gray, Hearing Officer Joia and School Board, failed to provide adequate notice of the Due Process Expulsion Hearing as required by law – and it is the policy and practice of Jefferson Parish School System to not provide timely notice. The Harrison Williams Family had less than twenty-four hours notice of the Hearing.

11.

"[N]o principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge are among the most fundamental rights in any proceeding where notice is required." *LaBrosse, Sr., v. St. Bernard Parish School Board*, 483 So.2d 1253 (La. App. 4 Cir. 2/14/1986). All Defendants nevertheless falsely charged Ka'Mauri with "possesses weapons prohibited under federal law" then found Ka'Mauri "guilty" of a different charge: "possession of a starter gun, stun gun and/or facsimile" without providing Ka'Mauri notice or the opportunity to defend against that charge.

12.

Defendants, Superintendent and School Board, failed to adopt a policy for the School Board Hearing, despite every opportunity to do so. Prior to the Hearing, Ka'Mauri asked for a policy on the Hearing and School Board attorney told Ka'Mauri's counsel there was no policy as this was the first hearing. At the School Board Hearing, Mark Morgan stated that tons of these had happened, "no one had made it a media sensation."

13.

Defendant, Ms. Adams, personally conducted the School Board Hearing on behalf of the Superintendent, but gave the Board legal advice throughout the Hearing. Ka'Mauri had previously objected to Ms. Adams presenting this case, as she is a Defendant and a fact witness, but that

objection went ignored. At the Hearing, when it was brought up that Ms. Adams would be a witness, Mr. Morgan stated "she is the board attorney." As such, the role that Ms. Adams played at the School Board Hearing caused Ka'Mauri to be subjected to an unfair hearing.

14.

Defendants, Superintendent, Hearing Officer Joia, and the Jefferson Parish School Board acted with bias, as they were unable to be impartial decision makers in Ka'Mauri's case. Defendant Superintendent and Hearing Officer Joia acted with bias at the Due Process Hearing. Defendant School Board acted with bias at the Appeal Hearing. The bias included, but is not limited to the following: First, Defendants were involved in every step of the Incident until the date of the Incident. Second, Defendants were so visibly distraught about the media attention this case has received. Third, Defendants received legal advice throughout the hearing from their "board attorney," to the point that Defendants could not actually act without bias when it came time to making a neutral decision. Finally, Defendants could not act without bias as a result of the pending litigation in this case, and the media attention surrounding same.

15.

All Defendants failed to give Ka'Mauri an impartial Hearing Officer Expulsion Hearing and an impartial School Board hearing. The transcript of the testimony from the School Board hearing is conscience shocking as to the testimony of Principal White, Hearing Officer Joia, and the School Board members itself.

16.

**Failure to Allow Ka'Mauri To Call Witnesses**

Defendants, Superintendent, School Board, and Ms. Adams, failed to allow Ka'Mauri to adequately call witnesses at School Board Hearing. Prior to the Hearing, Ka'Mauri submitted a

witness list. It had Superintendent Gray, Ms. Adams, and Solicitor General Murrill on it. Ms. Adams stated her testimony was privileged and irrelevant and the School Board said she is the "board attorney." Superintendent Gray did not show up to the Hearing, and was not present when called as Ka'Mauri's first witness. Solicitor General Murrill was "blocked" from testifying. The School Board and Superintendent submitted Ms. Germaine Gilson, and called her an "expert," and allowed her to testify that no due process violation had occurred – and she offered this legal conclusion. Ms. Adams gave legal advice as the Board attorney throughout the Hearing. Ka'Mauri was not afforded the same opportunity to call his witnesses to present legal conclusions and to testify as to the Due Process violations that had occurred in his case.

### Count IV.

### 42 U.S.C. § 1983, State and Federal Constitutional Fundamental Rights
### (The Harrison Williams Family Against All Defendants)

1.

Ka'Mauri and the Harrison-Williams Family reasserts the allegations of facts set forth hereinabove in Paragraphs 1 through 132. The Harrison Williams Family alleges this count against each Defendant in their individual and official capacities.

2.

All Defendants violated Ka'Mauri's rights to Procedural Due Process while acting under color of state law, individually and collectively. All Defendants also acted in their individual capacity. All Defendants had personal involvement in the actions amounting to Constitutional Violations. Ka'Mauri has a constitutional right to public education.

3.

Defendants are liable to Ka'Mauri for Defendants' violation of Ka Mauri's rights to Substantive Due Process because the unconstitutional actions of all Defendants were encouraged,

approved, caused by, tolerated, permitted or ratified by established customs, policies, practices, or procedures established by the Jefferson Parish School Board, and all Defendants.

4.

Additionally, the actions of Defendants as stated throughout this Complaint are so obviously wrong all reasonable officials should have known that Ka'Mauri's due process rights were being violated.

5.

**Right to Control of Education of Child**

"The child is not the mere creature of the state." *Pierce v. Society of Sister*, 268 U.S. 510 (1925). "The liberty protected by the Due Process clause of the United States Constitution includes the right of parents to establish a home and bring up children and to control the education of their own." *Troxel v. Granville*, 530 U.S. 57 (2000).

6.

**Interference with Upbringing**

All Defendants interfered with and are continuing to interfere with the Harrison-William Family's right to direct Ka'Mauri's upbringing free from government interference, including but not limited to by punishing Ka'Mauri for non-disruptive conduct in his own bedroom and by threatening a false and malicious referral to a social work assessment which would result in intrusion to the parent-child relationship. Upon information and belief, a social work referral would also intrude into the Harrison-William home and other constitutional rights.

7.

**Stigma**

Further, all Defendants have stigmatized the Harrison-Williams Family by making concrete assertions of wrongdoing by Ka'Mauri, and implicitly his parents, which have resulted in harm and impairment to the Harrison-Williams Family, including, but not limited to by impairing Ka'Mauri's education and educational opportunities. In addition, Ka'Mauri was *exposed* to a referral to the District Attorney for further action. Ka'Mauri's negative notoriety was admitted to in writing by Mr. Moise as recently as December 11, 2020.

8.

**Freedom of Expression**

All Defendants retaliated against the Harrison-Williams Family for seeking to vindicate their child's constitutional rights and for speaking publicly about the denial of their constitutional rights, in violation of the First Amendment of the United States Constitution and Article 1 Section 7 of the Louisiana Constitution.

9.

**Right to Privacy**

All Defendants violated the Harrison-William's Family's Right to Privacy pursuant to the Fourteenth of the United States Constitution and Article 1 Section 5 of the Louisiana Constitution by treating the Harrison-William's Family home as an extension of government property, and by taking the position that the Harrison Williams Family home is an extension of the classroom.

10.

**Failure to Train: Ka'Mauri versus School Board and Superintendent**

Defendants, School Board and Superintendent, failed to train and/or supervise its Hearing Officers, its teachers, and its principals, resulting in the deprivation of the Harrison William's Family constitutional rights. Defendants acted with Deliberate Indifference in its failure to train its employees with regard to student's constitutional rights. The policies, practices, and customs set forth herein were a driving force behind the numerous constitutional violations in this case that directly caused Ka'Mauri to suffer damages.

11.

**Punishment Does Not Match Crime**

Defendants, Superintendent and School Board, deprived Ka'Mauri of his right to public education for suspending him for a punishment that did not match the crime.

12.

**Denial of Appeal/Ultimate Show Appeal**

Defendants, Ms. Adams, Superintendent, and School Board, through its policy of not granting appeals for "suspended students," deprived Ka'Mauri of his right to an appeal for a period of ten (10) weeks, so much so, that by the time Ka'Mauri received an appeal – it was largely a "show appeal." Defendant School Board had made up its mind prior to walking into the Appeal.

13.

**Conduct that Shocks the Conscience**

All Defendants conduct from the date of the Incident until the School Board Appeal shocked the conscience sufficient enough to violate Ka'Mauri's substantive due process.

14.

### Inadequate Investigation

Defendants, Hearing Officer Joia and Superintendent Gray, conducted an inadequate investigation that resulted in a punishment that did not match the alleged "crime."

15.

### Unusual Injury- Severity of Charge

Defendants, Superintendent and School Board, subjected Ka'Mauri to an unusual injury as a result of the severity of the charge that was not overturned on appeal. Ka'Mauri currently has a weapons on campus charge on his permanent school record.

15.

### Policies are Vague and Overbroad

The policies allegedly issued by the Jefferson Parish School System that JPS claim to be persuasive to this case are vague and overbroad, as applied to the Incident and disciplinary actions taken thereafter. Further, Defendants attempt to apply LSA R.S. 17:416(C) to the privacy of the Harrison Williams Family home is an unconstitutionally vague application of that statute.

### COUNT V.
### Civil Conspiracy
### 42 U.S.C. §1985
### (Harrison Williams Family Against All Defendants)

1.

Ka'Mauri, a virtual student, and the Harrison-Williams Family, reassert the allegations of facts set forth hereinabove in Paragraphs 1 through 132. Count V is against all Defendants in their individual and official capacities. All Defendants had a personal role in the Civil Conspiracy, as defined herein.

2.

All Defendants conspired to deny the Harrison-Williams Family their State and Federal Substantive Constitutional rights as alleged herein, while acting under color of state law, and individually.

3.

All Defendants conspired to deny Ka'Mauri his procedural due process rights as alleged herein, while acting under color of state law, and individually.

**COUNT VI**
**Defamation**
**(Ka'Mauri Against Principal White, School Board, and Clay Moise )**

1.

Plaintiffs reassert the allegations of facts set forth hereinabove in Paragraphs 1 through 132, and Ka'Mauri asserts this count against Principal White, the School Board and Defendant, Clay Moise.

2.

Upon information and belief, Principal White, individually and in her official capacity, defamed Plaintiff to multiple individuals, throughout the Jefferson Parish School System, by knowingly, intentionally and maliciously making false statements concerning Ka'Mauri as set forth in this Petition. Substantial, ongoing damage to Ka'Mauri resulted, including but not limited to damage to his reputation, interference with his ability to have a clean school record, loss of education, loss of reputation, emotional distress, anxiety, humiliation, loss of enjoyment of life, and exposure to further action in the Criminal Justice system.

3.

Specifically, Principal White executed one or more documents falsely stating that Ka'Mauri "possesses weapons prohibited under federal law." Principal White did this without a

principal student conference, and submitted it following a heated conversation with Mr. Harrison and a very heated pre-expulsion meeting with Mr. Harrison and Ms. Williams.

4.

Principal White made these defamatory statements intentionally, on numerous occasions, knowing all the while that the alleged "weapon" was a BB gun, and then transmitted these statements to the "district," to Hearing Officer Joia, Ka'Mauri's parents, the School Board, the Superintendent, and likely numerous other Parties that will become apparent through discovery. Principal White knew that this statement was false; she knew the incident involved a BB gun and has testified that this is why she did not send a welfare check to Ka'Mauri's home.

5.

The Jefferson Parish School Board and Board member Clay Moise intentionally and maliciously defamed Ka'Mauri and the Harrison Williams Family (and counsel) in Mr. Moise's email communications to the public. As alleged herein, a multitude of statements said by Mr. Moise to the general public are malicious and false – and Mr. Moise knew that these statements were not true, as he sat through six and a half hours of testimony in this case. Mr. Moise made these knowingly false statements, which caused injury to the Harrison Williams Family, from his Jefferson Parish School Board email address, and on behalf of the Jefferson Parish School Board. As such, Mr. Moise and the Jefferson Parish School Board maliciously defamed Ka'Mauri, and his family following the Jefferson Parish School Board Appeal hearing, and upon information and belief, is continuing to do same. The following statements made by Mr. Moise are false, were distributed to third parties, and are defamatory in nature causing injury to the Harrison Williams Family:

    (a) "Besides the teacher, there were a number of other witnesses to the event;"
    (b) "There was no brother in the room";

60

(c) "Our administration was unable to contact either parent for an extended period of time and we had to call the local police to conduct a welfare check… this was disruptive to the class and school administration, and an unnecessary distraction for law enforcement;"

(d) If Ka'Mauri "had given a statement as requested by administration on the day of the event, you would have never heard of this;"

(e) "This attorney chose to use this child and his family to create an activist media frenzy and prohibit the school system from telling the whole story;"

(f) "As to the punishment, the parents acknowledged that they were aware of the regulations related to weapons (even facsimile weapons) and virtual learning;" and

(g) "This suspension is considered a minor offense and will in no way affect the young man's academic pursuits."

Mr. Moise sat through six and a half hours of testimony and knows that each of these statements are not true, yet chose to maliciously and intentionally make them to concerned members of the public anyway.

## COUNT VII
## Detrimental Reliance
## Principal White, School Board, Superintendent & Ms. Adams

1.

The Harrison Williams Family reasserts the allegations of facts set forth hereinabove in Paragraphs 1 through 132.

2.

Prior to the Due Process Hearing, the Harrison-Williams Family, through its counsel, was given a "pre-expulsion packet," as well as the "Jefferson Parish Policies and Procedures For Parents and Student," as well as the "Expulsion Flow Chart," upon specific request by the Harrison-Williams Family counsel. The fact that these were the policies and procedures that would apply at Ka'Mauri's hearing was undoubtedly a promise made by Defendants, Principal White, Ms. Adams, Superintendent Gray, and the School Board. They did not apply those policies and procedures at Ka'Mauri's hearing, and now refer to them as mere "advisory." Further, the Harrison

Williams Family specifically requested COVID related policies relevant for Ka'Mauri's hearing, and was informed they were in possession of all documents.

3.

Hearing Officer Joia informed the Harrison-Williams Family that she has to apply the law, and further stated several times that they would have the right to an appeal of the decision so long as they requested it within five days of the Hearing Officer Decision Letter.

4.

The Harrison-Williams Family reasonably and justifiably relied on the promises of Principal White, Ms. Adams, Superintendent Gray and the Jefferson Parish School Board's promise that these would be the policies and procedures, as well as the "Expulsion Flow Chart," that would apply to Ka'Mauri at his Due Process Hearing on September 22, 2020.

5.

The Harrison-Williams Family reasonably and justifiably relied on the statements made by Hearing Officer Joia that the Harrison-Williams Family would be entitled to an appeal.

6.

The Harrison-Williams Family's reliance on this promise was to their detriment, at these policies and procedures were not applied in the Due Process Hearing held for Ka'Mauri, and now, the Defendants, at the recommendation from Ms. Adams for each Defendant, is disregarding this promise made by the Representative of the Superintendent.

7.

The Policy specifically asserted that if a Due Process violation occurred, such as a procedural Due Process matter, then the charges would be dismissed. The policies include the following promises:

a. Providing a parent with a pre-expulsion packet. The pre-expulsion was incomplete as it did not have the Superintendent cover-sheet, did not provide the revised statutes applicable, and did not include the witness statements to be used at the Hearing. This is the policy, they relied on the information, reasonably, as the evidence to being used against Ka'Mauri to support the recommendation for expulsion for a possesses weapons under federal law violation;

b. The family was told they had all the policies they needed, then received a whole new set of policies after the hearing, and now are being shown new policies that were allegedly distributed by "robo-text:"

c. Principal White recommended a simultaneous expulsion with a suspension for a specified number of days. The Expulsion Flow Sheet indicates that this is a due process violation that should warrant a dismissal;

d. After the meeting with Principal White on September 16, 2020, the Harrison-Williams Family learned that Defendants (independently or in concert) obtained an additional witness statement in an attempt to bolster the already issued recommendation for expulsion;

e. The recommendation for expulsion did not come from the Superintendent on School Board referral, as required by the Policy given to the Harrison-Williams Family the day before the Due Process Hearing. In the policies given to the Harrison-Williams Family by Defendants, the expulsion recommendation for a weapons-violation was to come from the superintendent through school board referral, not the principal, and, as such, the Harrison-Family believed that they had a procedural due process defense prior to entering the Due Process Hearing, and reasonably relied on same, yet this argument went ignored by the Defendants at the Hearing and resulted in damages as a result of the Hearing Officer rejecting this defense;

f. The Harrison-Family received notice of the Due-Process hearing only 22.5 hours prior to the Hearing.

8.

These violations are all elements of procedural due process as outlined in the documents provided to the Harrison-Family and should have resulted in the entire case being dismissed, as stated by the JPS policies and procedures definition of "Due Process." The Harrison Williams

Family prepared for the Hearing in a manner that would allow the charges to be dismissed as stated in the policies, and were then told that these were "clerical" errors and not due process violations.

9.

Despite the numerous violations of law and JPS policies and representations that the proceedings against Ka'Mauri were not dismissed. Ms. Adams, astonishingly characterized these violations as mere "clerical errors" and stated that "quibbling" over them "will not go very far."

10.

The Harrison Williams Family suffered damages from their justifiable reliance of the policies and procedures provided by Defendants because as they were not applied correctly or adequately. The resulting damages to the Harrison-Williams Family include but are not limited to the six-day suspension of Ka'Mauri, a recommendation of social work assessment, and emotional damages.

11.

The Harrison Williams Family relied, to their detriment, on the fact that Ka'Mauri would receive an impartial hearing officer due process hearing, and an impartial school board hearing.

12.

Ka'Mauri did not receive an impartial due process hearing or an impartial school board hearing, as evidenced by the testimony and behavior of Defendants at the School Board Hearing.

**COUNT VIII**
**Intentional Infliction of Emotional Distress,**
**or Alternatively Negligent Infliction of Emotional Distress**
**(The Harrison Williams Family Against All Defendants)**

1.

The Harrison-Williams Family reasserts the allegations of facts set forth hereinabove in Paragraphs 1 through 132.

2.

Plaintiff alleges that the actions of all Defendants herein collectively rise to the level of extreme and outrageous conduct, that the emotional distress suffered by the Harrison-Williams Family is severe, and that all Defendants intentionally desired to inflict severe emotional distress or should have known that severe emotional distress would be certain or substantially certain to result from their conduct which occurred over a period of days commencing on September 11, 2020, and is still on-going. Defendants actions caused the Harrison-Williams Family emotional distress, anxiety, humiliation, loss of enjoyment of life, and damage by violating their constitutional rights.

3.

Alternatively, Plaintiffs, the Harrison-Williams Family, allege that actions of all Defendants, as pleaded herein, collectively was a cause-in-fact of the Harrison-Williams Family's emotional distress, anxiety, humiliation, loss of enjoyment of life, and violation of rights that Defendants owed a duty to the Harrison-Williams Family to prevent Defendants' intentional and negligent infliction of emotional distress upon them; and that blatantly breached that duty causing the Harrison-Williams Family, emotional distress, anxiety, humiliation, loss of enjoyment of life, and loss of constitutional rights.

4.

Further, Principal White, upon information and belief, discussed the incident and obtained written statements from Ka'Mauri which humiliated him among his peers, when the statements were not necessary.

5.

The entire School Board Hearing was so fundamentally unfair and egregious, that Ka'Mauri and the Harrison Williams Family suffered substantial emotional distress as a result of the conduct of the Defendants at this hearing.

6.

Finally, the actions of the Jefferson Parish School Board, through its elected board member Mr. Moise, in the communication to the public is egregious and Mr. Moise should have known that these false statements would cause extreme distress to the Harrison Williams Family.

**COUNT IX:**
**Negligence**
**(The Harrison Williams Family Against School Board, Superintendent,**
**Ms. Adams, and Hearing Officer Joia)**

1.

Plaintiffs reassert the allegations of facts set forth hereinabove in Paragraphs 1 through 132.

2.

The School Board is liable to Plaintiffs for damages and injuries caused by their negligent acts and omissions, including but not limited to the following:

a.  Failure to train Teachers;

b.  Failure to train Principals;

c.  Failure to train Behavioral Interventionists;

d.  Failure to train Superintendents;

e.  Failure to train Hearing Officers;

f.  Failure to supervise application of policies and procedures;

g.  Failure to intervene and correct where a knowingly false charge has been asserted against a student that triggers automatic expulsion recommendations;

h.  Wrongful upholding the Hearing Officer Decision;

i.  Upon information and belief, failure to comply with LSA R.S. 17:416.8 and convene prior to the 2021 school year and create a discipline policy "review committee," especially given the new environment of Virtual Learning. It should be noted that two sets of policies are at issue in this case: Board Policy and Policies and Procedures for Students and Teachers. The former has not been updated since 2019 (as discovered on their website), and the latter was written in expectation of the 2019 school year;

j.  Failure to create a policy for a School Board Hearing;

k.  Failure to create a fair School Board Hearing; and

l.  Failure to train its own School Board members regarding making false statements to the public.

3.

Superintendent Gray is liable to Plaintiffs for damages and injuries caused by his negligent acts and omissions, including but not limited to the following:

a.  Failure to train his appointed "designee;"

b.  Failure to appoint a neutral and impartial designee;

c.  Failure to follow the Policies and Procedures of Jefferson Parish; and

d.  Wrongful discipline imposed on Ka'Mauri.

4.

Ms. Adams is liable to Plaintiffs for damages and injuries caused by their negligent acts and omissions, including but not limited to the following:

a.  Failure to properly advise;

b.  Failure to allow a Neutral Hearing Officer and intentionally interfering with decision making of the Hearing Officer who was supposed to be the Neutral Hearing Officer;

c.  Retaliating against Ka'Mauri, by a continuous denial of his statutory and state and federal constitutional due process, in retaliation for the Harrison-Williams Family's speaking with the press; and

d.  Intentionally interfering with the entire process for a recommendation of expulsion for a weapons possession charge in a manner, which rendered it fundamentally unfair and denied him access to fair and independent decision makers.

5.

Hearing Officer is liable to Plaintiff for damages and injuries caused by their negligent acts and omissions, including but not limited to the following:

a.  Failure to properly investigate Ka'Mauri's claim;

b.  Failure to fairly conduct an impartial hearing; and

c.  Wrongful suspension of Ka'Mauri and social work referral.

**COUNT X:**
**First Amendment Retaliation**
**The Harrison Williams Family Against All Defendants**

1.

The Harrison Williams Family reasserts the allegations of facts set forth hereinabove in Paragraphs 1 through 132. All Defendants retaliated against Ka'Mauri while acting under color of

state law, and individually. All Defendants played a personal role in retaliating against Ka'Mauri for the Harrison Williams Family threatening to take this case public, and the actions thereafter, including the inability to give Ka'Mauri a fair and neutral School Board Appeal.

2.

The Harrison Williams Family engaged in constitutionally protected activity (freedom of speech to discuss this case), and every time the Harrison Williams Family mentioned taking this case public, and actually took this case public, all Defendants, individually and officially, acted with more and more hostility.

3.

The Harrison Williams Family received anything but Due Process in the days leading up to and during the Due Process Hearing on September 22, 2020, and at the School Board Hearing on December 4, 2020.

4.

It is clear that Defendants were angry about the media from the very week that Ka'Mauri received a Hearing Officer decision, and in his attempts to request an appeal or Superintendent review. By e-mail dated September 25, 2020, Ms. Adams stated to the Harrison Williams Family Counsel as follows:

> **I cannot, and will not, recommend Board Review of Ka'Mauri's suspension, nor will I recommend expungement of his record <u>because</u> the facts are simply not as you have presented them *in your similarly unprofessional efforts to litigate this matter in the press.***

5.

Defendants, the School Board, have denied the Harrison Williams Family request to receive an un-encrypted copy of the Due Process Hearing that took place on September 22, 2020, and believe that they are being denied same as a result of their expressed desire to speak freely and

openly about the events of the Incident. As it stands, the video is encrypted to Harrison Williams Family Counsel's Law firm computer, and not available in a format that is transferrable to third parties, including Mr. Harrison and Ms. Williams, themselves. When they requested a regular copy of the video for distribution, the Harrison Williams Family were denied on behalf of the School Board.

6.

The Harrison Williams Family believes that had Mr. Harrison not informed Defendants about "Six on Your Side," and had the Plaintiffs not spoken to the media about the facts of this case, all Defendants would have acted more reasonably and not retaliated against Ka'Mauri in this case. The "Six on Your Side" comment was placed unnecessarily in Ka'Mauri's student records prior to any disciplinary action was decided – it was also brought up again at the School Board Hearing.

7.

As stated, at the Hearing, Mr. Morgan angrily stated: "The only thing that has never happened before is because no one has made a media sensation and the only reason that happened is because of COVID because we're in a virtual world." It was clear that Mr. Morgan and the School Board were not pleased with the media presence from the beginning as the parties arrived to the Hearing with paper on the door that said "no cameras."

8.

Jefferson Parish School Member, Clay Moise, individually and in his official capacity, shamed and defamed Ka'Mauri for what has taken place in the media, to a third party, by e-mail on December 10, 2020, and December 11, 2020. Mr. Moise knew that these statements were false, yet still continued to make inaccurate statements about the facts of this case, and the media, to the

public when discussing Ka'Mauri's case. Mr. Moise also stated that this case would not have happened, but for the media frenzy that the attorney caused.

9.

Additionally, if the Harrison Williams Family prevails on its First Amendment Retaliation Claim, the Harrison Williams Family is entitled to punitive damages as a result of this First Amendment Retaliation Claim against the Defendants in their individual capacities and prays for same in the Prayer for Relief.

**Count XI:**
**"Unconstitutional Conditions Doctrine"**
**(Ka'Mauri Versus School Board and Superintendent)**

1.

The Harrison Williams Family reasserts the allegations of facts set forth hereinabove in Paragraphs 1 through 132.

2.

Ka'Mauri has a right to public education, and a requirement that Ka'Mauri receive education. Should Ka'Mauri not attend education, his parents would certainly be held accountable for "truancy." As such, Ka'Mauri had to choose between his right to receive public education and his right to privacy, among other constitutional rights that were violated by Defendants as stated herein.

3.

Defendants, School Board and Superintendent, have consistently taken the position that while receiving virtual instruction in the home, Ka'Mauri does not have the ordinary reasonable expectation of privacy that he would otherwise have under the state and federal constitution.

4.

As such, Defendants have imposed an unconstitutional condition on Ka'Mauri in violation of the Unconstitutional Conditions Doctrine. A party cannot "consent" to operating under unconstitutional conditions.

**Count XII:**
**"Takings Claim"**
**LSA-R.S. 13:5111**
**(Harrison Williams Family against The Jefferson Parish School Board)**

1.

The Harrison Williams Family reasserts the allegations of facts set forth hereinabove in Paragraphs 1 through 132.

2.

At multiple different times from September 9, 2020, until this date, the Jefferson Parish School Board has taken the position that the Harrison Williams Family private home is a "classroom" when virtual instruction is occurring, and all on campus policies and procedures, and the law (specifically LSA R.S. 17:416) applies to the home, just as it would a school dance, a school bus, or at a school event.

3.

The Harrison Williams Family home is their private property.

4.

The Jefferson Parish School Board has never offered the Harrison Williams Family rent, or any income, with regard to its "use" of the Harrison William's Family home as a Jefferson Parish School System classroom, despite the unusual position that "right now the home on camera is a classroom," as testified to at the Louisiana Legislature by Defendants' counsel. The Jefferson

Parish School Board certainly does not provide a liability policy for the Harrison Williams Family home, as it would for a school-sponsored event.

5.

As a result of this, and all of the facts stated herein, Defendants, a political subdivision of the State of Louisiana, has appropriated the Harrison Williams Family home for government classroom use, without paying the Harrison Williams Family any just compensation for same in direct violation of LSA R.S.  13:5111.

6.

The Harrison Williams Family is entitled to damages and fees as a result of this appropriation of his property by a political subdivision without appropriate compensation.

**Count XIII**
**Spoliation of Evidence**
**Ms. Adams**

1.

The Harrison Williams family reasserts claims 1 through 132 as if more fully stated herein.

2.

As a government employee, and public officials, Ms. Adams has the duty to keep and maintain all documents received as public records.

3.

Ms. Adams breached this duty by intentionally deleting and destroying documents and letters surrounding this event.

4.

At the Hearing on December 4, 2020, when asked about statements made about the case and alleged witness "threats", Ms. Adams indicated she deleted them. Ms. Adams was unable to produce these to the School Board when asked at the Appeal Hearing on December 4, 2020.

5.

This is a violation of the public records laws of the State of Louisiana, and spoliation of evidence. While the Harrison Williams Family is uncertain as to the content of the emails, they are entitled to a presumption in their favor. Due to the content of an email that went out in the past week, the Harrison Williams Family has good reason to believe that evidence is being intentionally deleted that might be beneficial to the claims that the Harrison Williams Family asserts herein.

## CONSTITUTIONAL CHALLENGES

1. Jefferson's Parish School Policies are facially unconstitutional as they are interpreted or as applied to virtual educational environments;

2. LSA R.S. 17:416 is unconstitutional facially and as applied to virtual learning environments and to the home because it captures constitutionally protected conduct and fails to satisfy constitutional standards regarding fundamental rights of privacy, parental independence, and fair notice;

3. LSA R.S. 17:416(C) is unconstitutional as interpreted and applied by the JPSB because it deprives students of procedural Due Process because it deprives students and parents of review by the School Board and the courts of serious and life-altering charges relative to possession of firearms, particular where those statutes are interpreted as applying to the home;

74

4. LSA R.S. 17:416, JPS "Procedures & Policies for Parents & Students" and JPS School Board Policies are unconstitutionally vague and overbroad to the extent they are applied to conduct occurring in a student's home and expose the parents and child to egregious civil consequences and criminal charges for constitutionally protected conduct;

5. Applying LSA R.S. 17:416, JPS "Procedures & Policies for Parents & Students," or JPS School Board "Dangerous Weapon" Policies to non-threatening, non-disruptive conduct in a student's home also infringed the Harrison-William's Family's Right to Keep and Bear Arms pursuant to Article 1, Section 11, of the Louisiana State Constitution and the Second Amendment; their right to privacy and to be free from unwarranted government intrusion in their home; and to control Ka'Mauri's upbringing free from unwarranted government interference.

## DAMAGES

Plaintiffs have suffered, and will continue to suffer, the following damages, injuries, and losses as a direct and proximate result of Defendants violations of the Harrison-Williams' Family rights:

a) General Damages;

b) Mental pain, suffering, anguish and embarrassment, humiliation and loss of self-esteem;

c) Future counseling and tutoring;

d) Lost Income;

e) Legal expenses and other costs

f) Punitive Damages (for applicable Defendants in capacities as permitted by law);

g) All damages and fees now afforded by LSA R.S. 17:416; and

h) Other economic damages and losses as will be proven at trial.

## ADDITIONAL RELIEF

Plaintiffs request any other relief to which they may be entitled under law or equity, including but not limited to:

a) Judicial Review of the School Board Hearing that took place on December 4, 2020;

b) Expungement of Ka'Mauri's discipline from September 11, 2020, or alternative injunctive relief from this Court ordering that Defendants expunge Ka'Mauri's record;

c) An apology letter to be placed in Ka'Mauri's file;

d) Permanent Injunctive Relief for the Court to supervise the Jefferson Parish's Compliance[18] over the next five (5) years with regard to the following:

    a. Due Process training of employees including Hearing Officers; and

    b. Implementation of Discipline relative to Virtual Instruction policies.

## TRIAL BY JURY

The Harrison-Williams Family is entitled to and requests a trial by jury.

**WHEREFORE,** premises considered, Plaintiffs, Ka'Mauri Harrison, Nyron Harrison, and Thelma Williams, pray that Defendants, the Jefferson Parish School Board, Dr. James Gray, Hearing Officer Terri Joia, Principal Cecily White, and Ms. Patricia Adams be served with this lawsuit and that judgment be issued against Defendants for the Additional Relief as stated above, for injunctive relief (as stated), and an award for all damages sustained by the Harrison-Williams Family, including but not limited an expungement of Ka'Mauri's disciplinary record, or an order

---

[18] Based upon the FOIA requests produced, as stated herein, Jefferson Parish is entering into approximately one documented settlement agreement with the Department of Education, Civil Rights Division, a year, Plaintiffs submit that Court supervision is necessary to prevent any further irreparable harm (although irreparable harm not a requirement for injunctive relief for constitutional violations).

of permanent injunctive relief requiring same, and to for all amounts owed to them pursuant to the causes of action as stated herein, damage to their reputation, and economic damages relating thereto including loss of due process rights, and emotional distress, anxiety, humiliation, loss of enjoyment of life, penalties, costs, and attorney's fees.

Respectfully Submitted

  */s/ Chelsea B. Cusimano*
Douglas R. Kraus Bar #26668
Chelsea B. Cusimano #34857
Susannah C. McKinney #24349
***Brener & Kraus, LLC***
3640 Magazine Street
New Orleans, Louisiana  70115
Telephone:  (504) 302-7802
*dkraus@brenerlawfirm.com*
*cbcusimano@brenerlawfirm.com*
*smckinney@brenerlawfirm.com*
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of December, 2020, a copy of the foregoing has been served upon all counsel of record in this action via electronic service through the Court's CM/ECF system.

/s/ *Chelsea B. Cusimano*
Chelsea B. Cusimano

SERVE INSTRUCTIONS:

Clay Moise
Jefferson Parish School Board
501 Manhattan Boulevard
Harvey, Louisiana 70058