### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**NYRON HARRISON, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                    **NO. 20-2916**
                                              **c/w 21-40**

**JEFFERSON PARISH SCHOOL**                   **SECTION: "G"**
**BOARD, ET AL.**

### ORDER AND REASONS

Plaintiffs in the above-referenced consolidated cases filed suit against the Jefferson Parish School Board ("JPSB"), Superintendent James Gray ("Gray"), and various other school board employees, members, and school teachers ("Defendants"), following incidents where Ka'Mauri Harrison and T.B. were separately disciplined for showing a BB gun on camera during virtual learning. The State of Louisiana intervened on behalf of Plaintiffs,[1] and Plaintiffs later settled their claims with Defendants.[2] Pending before the Court are virtually identical Motions for Judgment on the Pleadings filed by Defendants in both of the consolidated cases.[3] Having considered the motions, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motions.

### I. Background

The above-referenced consolidated cases are before the Court following discipline imposed

---

[1] 20-2916, Rec. Doc. 58; 21-40, Rec. Doc. 29.

[2] 20-2916, Rec. Doc. 114; 21-40, Rec. Doc. 69.

[3] 20-2916, Rec. Docs. 127, 139.

on two students by the JPSB. Nyron Harrison and Thelma Williams ("Harrison-Williams Family") and Timothy Brown ("Brown") separately brought suit against Defendants after Ka'Mauri Harrison ("Ka'Mauri") and T.B. were separately disciplined for showing a BB gun on camera during virtual learning.[4] Ka'Mauri and T.B. were recommended for expulsion by the principals of their respective schools.[5] Both students then had hearings before the hearing officer, Terri Joia, and were ultimately suspended.[6] Both families requested an appeal of the suspension hearing pursuant to Louisiana Revised Statute § 17:416 ("Section 17:416").[7] JPSB initially denied both requested appeals because it was JPSB's position that a student was only guaranteed an appeal if a student was expelled.[8]

The Harrison-Williams Family filed suit on October 2, 2020 in the 24th Judicial District Court for the Parrish of Jefferson.[9] Brown filed suit in the same court on December 14, 2020.[10] Shortly after the Harrison-Williams suit was filed, but before the Brown suit was filed, on October 23, 2020, the Louisiana legislature passed House Bill 83, known as the Ka'Mauri Harrison Act. On November 5, 2020, Louisiana Governor John Bel Edwards signed House Bill 83 into law.[11] The Ka'Mauri Harrison Act revised Section 17:416 as follows:

> (C)(4) The parent or tutor of the pupil <u>who has been recommended for expulsion pursuant to this Section</u> may, within five days after the decision is rendered, request

---

[4] 20–2916, Rec. Doc. 30; 21-40, Rec. Docs 1–2, 35.

[5] 20 – 2916, Rec. Doc. 30 at 2; 21-40, Rec. Doc 1–2.

[6] 20-2916, Rec Doc. 30 at 14; 21-40, Rec. Doc. 1–2 at 10.

[7] 20-2916, Rec. Doc. 30 at 19; Rec. Doc 1–2 at 10.

[8] 20-2916, Rec. Doc. 30 at 19.

[9] 20-2916, Rec. Doc. 1–1.

[10] 21-40, Rec. Doc. 1–2.

[11] *See* La. Rev. Stat. § 17:416(c).

the city or parish school board to review the findings of the superintendent or his designee at a time set by the school board; otherwise the decision of the superintendent shall be final. If requested, as herein provided, and after reviewing the findings of the superintendent or his designee, the school board may affirm, modify, or reverse the action previously taken. <u>The parent or tutor of the pupil shall have such right of review even if the recommendation for expulsion is reduced to a suspension.</u>

(C)(5)(a) The parent or tutor of the pupil <u>who has been recommended for expulsion pursuant to this Section</u> may, within ten days, appeal to the district court for the parish in which the student's school is located, an adverse ruling of the school board in upholding the action of the superintendent or his designee. The court may reverse or revise the ruling of the school board upon a finding that the ruling of the board was based on an absence of any relevant evidence in support thereof. <u>The parent or tutor of the pupil shall have such right to appeal to the district court even if the recommendation for expulsion is reduced to a suspension.</u>

(b)  If a judgment is rendered in favor of a student who sought judicial review of a decision of a school board pursuant to this Paragraph, <u>the judgment may include an award for reasonable attorney fees if the court finds any school official acted in a grossly negligent manner; with deliberate disregard for the consequences of his actions to the student; with willful or malicious indifference; with intent to deprive the student, his parent, guardian, or tutor of due process; or initiated a charge that is knowingly false.</u> The court may award <u>any damages appropriate under the circumstances</u> and render any other appropriate relief including but not limited to requiring the school board to issue an official apology letter, which shall be provided to the student, his parent, guardian, or tutor, and retained in the student's educational records.

. . .

K. For the purposes of this Section, "virtual instruction" means instruction provided to a student through an electronic delivery medium including but not limited to electronic learning platforms that connect to a student in a remote location to classroom instruction. A city or parish school board discipline policy shall clearly define the rules of conduct and expectations of students engaged in virtual instruction, shall provide for notice of such rules and expectations to the parents and guardians of students, shall include clearly defined consequences of conduct, shall be narrowly tailored to address compelling government interests, and shall take into consideration the students' and their families' rights to privacy and other constitutional rights while at home or in a location that is not school property.[12]

---

[12] *Id.*

The legislation further provides that it will apply retroactively, applying as of March 13, 2020.[13]

The day before Governor Edwards signed Act 48 into law, JPSB approved an Interim Virtual Discipline Policy, which provided that during virtual learning, "[w]hile students and parents normally have an expectation of privacy in their home, conduct that occurs in front of a camera, and in view of peers and teachers in the virtual classroom, shall be governed by applicable law and District policy."[14] JPSB has since allegedly asked parents to sign a waiver document agreeing to the terms of the Interim Virtual Discipline Policy.[15] After the passing of the Ka'Mauri Harrison Act, Ka'Mauri and T.B. were both given an appeal hearing in front of the JPSB.[16] The School Board upheld suspensions for both students.[17]

On March 2, 2021, the State of Louisiana (the "State") was granted leave to intervene in the Harrison-Williams case,[18] and on March 12, 2021, the State was granted leave to intervene in the Brown case.[19] In both cases, the State filed a complaint in intervention against JPSB and Gray, in which the State asserted five counts. First, the State claims that JPSB acted ultra vires by:

> purporting to regulate non-disruptive conduct in a student's private home; purporting to suspend or expel students without complying with statutory requirements; purporting to suspend or expel students for offenses that unequivocally don't apply to the facts alleged by JPSB employees; failing to provide meaningful appellate review in cases where students have been recommended for expulsion; purporting to adopt and apply an interim virtual discipline policy that does not comply with the Ka'Mauri Harrison Act; and

---

[13] *See id*; HB No. 83.

[14] 20-2916, Rec. Doc. 58 at 13.

[15] 21-40; Rec. Doc. 1–2 at 14.

[16] *Id.*

[17] *Id.*

[18] 20-2916, Rec. Doc. 58.

[19] 21-40, Rec. Doc. 28.

purporting to condition the provision of education on waivers of rights under Louisiana statutes, the Louisiana Constitution, and the United States Constitution.[20]

Second, the State alleges that JPSB has not complied with Section 17:416.8 by failing to establish a disciplinary policy review committee and to at least annually review its discipline policies for the 2020–2021 school year.[21] Third, the State contends that JPSB, in passing the Interim Virtual Discipline Policy, failed to comply with the Ka'Mauri Harrison Act, because such Policy does not respect the privacy of a student and their family in the home and instead attempts to regulate non-disruptive student conduct in the home.[22]

Fourth, the State claims that Defendants have not complied with Section 17:416 by:

inter alia, refusing or failing to adhere to procedures provided to students *and their counsel* prior to hearings; adjudicating students guilty of offenses other than the offenses for which they were provided notice; charging and adjudicating students guilty for conduct outside of JPSB's authority to regulate, including non-disruptive conduct in the student's private home; arbitrarily charging and adjudicating students guilty of offenses that facially and obviously do not apply to the conduct alleged by JPSB employees; and refusing appeals for students recommended for expulsion as required by Louisiana law.[23]

Fifth, and finally, the State alleges that JPSB has engaged in a policy or practice of violating the due process rights of students and their parents under the United States Constitution and the Louisiana Constitution.[24] The State asks this Court to: (i) declare that Section 17:416 does not extend to non-disruptive conduct in the private home; (ii) declare that JPSB and its employees have acted ultra vires and in violation of Section 17:416 and Section 17:416.8; (iii) declare that

---

[20] 20-2916, Rec. Doc. 58 at 19.

[21] *Id.* at 19–20.

[22] *Id.* at 20.

[23] *Id.* at 20–21.

[24] *Id.* at 19.

JPSB has a policy or practice of violating due process rights of students and their parents; (iv) preliminarily and permanently enjoin JPSB and its employees from further ultra vires, unlawful, and unconstitutional acts; and (v) award the State its costs and attorney's fees.[25]

JPSB and Gray answered the Complaint in Intervention and asserted a counterclaim.[26] In the counterclaim, JPSB and Gray argued that Act 48, the Ka'Mauri Harrison Act, is unconstitutional under the Fourteenth Amendment of the United States Constitution and Article I, § 2 of the Louisiana Constitution.[27] Plaintiffs then reached a settlement with Defendant, and filed a joint stipulation of dismissal, which this Court granted.[28] Pursuant to that joint stipulation, the Court dismissed with prejudice all claims of the Harrison-Williams family and the Brown family against Defendants, and all of Defendants' counterclaims against the Harrison-Williams family and the Brown family.[29] However, the dismissal "specifically reserve[ed] Defendants' claims in their counterclaim as to the Louisiana Attorney General and reserve[ed] all claims made by the Louisiana Attorney General against Defendants."[30] On August 8, 2021, Defendants' counterclaim was dismissed.[31]

On August 25, 2021, JPSB and Gray ("Defendants") filed the instant "Motion for Judgment on the Pleadings on Complaint in Intervention of State of Louisiana."[32] On September 27, 2021,

---

[25] *Id.*

[26] 20-2916, Rec. Doc. 63

[27] *Id.* at 10.

[28] 20-2916, Rec. Doc. 126; 21-40, Rec. Doc. 80.

[29] *Id.*

[30] *Id.*

[31] Rec. Doc. 119.

[32] Rec. Doc. 127. Defendants filed a virtually identical motion in the Brown case. After the cases were consolidated, the motion pending in the Brown case was also entered into the record in the Harrison/Williams case.

with leave of Court, the State filed its opposition to the motion.[33]  On October 15, 2021, Defendants filed a reply.[34]

## II. Parties' Arguments

### A.    *Defendants' Arguments in Support of the Motion*

Defendants make three main arguments in support of the motion for Judgment on the Pleadings. First, Defendants argue that the State lacks standing because Plaintiffs' claims against Defendants have been settled and dismissed.[35] Second, Defendants argue that the State does not have a right of intervention.[36] Third, Defendants argue that the Attorney General lacks authority to challenge disciplinary policies or state education funding.[37]

Defendants assert that the State lacks standing because, under Fifth Circuit precedent, an intervenor lacks standing after dismissal of the party who originated the action when no independent basis for jurisdiction remains over the intervention claims.[38] Defendants argue that the State "lacks standing and its claims are moot" because it cannot "establish an independent basis for jurisdiction as an intervenor following the resolution and dismissal" of Plaintiffs' claims.[39] Defendants argue that "the only non-speculative allegations" in this case "are those related to the

---

*See* Rec. Doc. 139. For ease of reference the Court cites the motion filed first in the Harrison/Williams case. This order applies to both, identical motions.

[33] Rec. Doc. 130. The State filed a virtually identical opposition in the Brown case. *See* Rec. Doc. 140.

[34] Rec. Doc. 138. Defendants filed a virtually identical reply in the Brown case. *See* Rec. Doc. 141.

[35] Rec. Doc. 127 at 1.

[36] *Id.* at 2.

[37] *Id.* at 3.

[38] Rec Doc. 127–2 at 11.

[39] *Id.*

claims of Plaintiffs, which have been fully resolved and dismissed."[40] Defendants contend that absent Plaintiffs' claims, "the Complaint in Intervention lacks a single concrete fact—not one name, date, time, place or specific act of the School Board related to student discipline."[41]

Furthermore, Defendants argue that the State "asserts a general right of intervention" rather than a "specific right applicable to a suit against a school board challenging a student disciplinary decision."[42] Defendants assert that there is "no constitutional or legal authority providing the Attorney General the right to assert these or any related claims arising under the student discipline statutes," and therefore the State "lacks statutory authority, and thus legal standing" to pursue this claim.[43]

Defendants further argue that the State can no longer establish a right of intervention to pursue a cause of action against Defendants. They assert that there is no continued right to intervene under Federal Rule of Civil Procedure 5.1 or 28 U.S.C. § 2403 because all claims challenging the constitutionality of Louisiana Revised Statute § 17:416 have been dismissed.[44] Accordingly, Defendants assert that "continued intervention on this ground must fail."[45] Defendants also argue that the State does not meet any of the grounds for continued intervention under Federal Rules of Civil Procedure 24(a) or 24(b).[46] They assert that the State has no "grant

---

[40] *Id.* at 9.

[41] *Id.*

[42] *Id.* at 14.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.* at 15.

of an unconditional or conditional right . . . to intervene in cases involving claims by students and their parents against a public school system and school board challenging disciplinary action against the student and raising personal constitutional rights related to such discipline."[47] Defendants further assert that the State has no legitimate, particularized interest in the outcome of this litigation, and that the State's asserted interest in protection of state education funds is "unquestionably within the exclusive purview" of the Board of Elementary and Secondary Education ("BESE") and the Louisiana Department of Education ("LDOE").[48] Defendants contend that the State's "policy or practice" claims against Defendants "share no common questions of law or fact" with Plaintiffs' claims that have been dismissed.[49]

Lastly, Defendants contend that the Attorney General lacks the authority under Louisiana law to sue Defendants to enforce disciplinary statutes because that authority lies instead with the BESE and the LDOE.[50] Defendants argue that under the Louisiana First Circuit Court of Appeals' decision in *State v. Abbot Laboratories, Inc.*, if a state agency has specific statutory authority to bring a lawsuit, "it supersedes the authority of the Attorney General to intervene or bring suit under Article 4, § 8 of the Louisiana Constitution and La. Rev. Stat. § 15:3056."[51] Because BESE has the power to "sue and be sued," and LDOE has "the power to sue and be sued in matters related to 'administer[ing] the functions of the state superintendent of education,' [and BESE],"[52]

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at 20.

[51] *Id.* at 22.

[52] *Id.* at 21–22.

Defendants contend that this authority "overrides and trumps the Attorney General's general intervention authority."[53] Defendants argue that the Louisiana Attorney General's own official opinion recognizes this authority of the BESE.[54]

### B.    The State's Arguments in Opposition to the Motion

In response, the State makes four principal arguments. First, the State argues that Plaintiffs' motion should be considered a motion for summary judgment, rather than a motion for judgment on the pleadings, because it introduces facts outside of the pleadings.[55] and that the motion for summary judgment must be denied.[56] Second, the State argues that it does have standing and that its claims are not moot.[57] Third, the State contends that it does have authority to bring this suit under Louisiana law.[58] Finally, the State contends that Defendants' dispositive motions have not complied with Rule 12 or Rule 56, and the Court should bar Defendants from submitting any additional motions.[59]

The State argues that because Defendants rely on events outside of the complaint and answer, such as "settlements with co-Plaintiffs, a state court judgment, policy changes, and an Attorney General opinion," Defendants' motion should be considered a motion for summary judgment, rather than a motion for judgment on the pleadings.[60] The State contends that this motion

---

[53] *Id.*

[54] *Id.* at 23.

[55] Rec. Doc. 130 at 4–5.

[56] *Id.*

[57] *Id.* at 5–21.

[58] *Id.* at 11.

[59] *Id.* at 21–22.

[60] *Id.* at 4.

for summary judgment should be denied because it does not identify the proper legal standard, does not attach evidentiary support, and does not attach a statement of material facts which they contend present no genuine issue for trial.[61]

The State further argues that it has standing and that its claims are not moot. The State contends that when this Court granted intervention, it necessarily held that the State had standing, because an intervenor must have standing when it seeks additional relief beyond what the plaintiff requests.[62] Because the State sought declaratory relief that the private plaintiffs did not, injunctive relief that was broader than what the private plaintiffs sought, and brought additional claims that the private plaintiffs did not, the Stare argues that the Court's order granting intervention necessarily determined that the State had standing.[63]

In addition, the State argues that it has standing to assert claims for violations of its citizens' constitutional rights.[64] The State contends that the State may bring a *parens patriae* action to assert the rights of its citizens.[65] The State argues that it has a quasi-sovereign interest in "assuring that the benefits of federal law and civil rights are not denied to its general population," and that this interests exists "apart from the interests of the private parties."[66] The State further argues that it has alleged that "JPSB has a policy, practice, or custom" of violating students' rights, and thus the State has an interest in ensuring compliance with state and federal law that is independent of the

---

[61] *Id.*

[62] *Id.* at 6.

[63] *Id.*

[64] *Id.* at 7.

[65] *Id.*

[66] *Id.* at 9.

original plaintiffs' claims for relief.[67] The State contends that in addition to JPSB's "long history of constitutional and civil rights violations . . . that this Court has multiple cases alleging similar due process and privacy violations by Defendants establishes that a pattern, practice, or policy of such violations is plausible."[68]

Furthermore, the State contends that, under Louisiana law, the Attorney General has the authority to "obtain judicial assistance in compelling political subdivisions to comply with Louisiana law."[69] The State argues that the BESE does not have *exclusive* authority over the education system.[70] The State suggests that JPSB admitted that the Attorney General had the authority to enforce Section 17:416 when it asserted a counterclaim against the Attorney General that the statute was unconstitutional, because a plaintiff may not sue a state official who lacks the power to enforce the challenged statute.[71]

The State avers that it has authority to sue based on its "exposure to recoupment," because JPSB is contractually obligated to comply with the federal constitution and federal law, and "various state agencies have exposure to the federal government for repayment" of funds if JPSB breaches this agreement.[72]

Lastly, the State contends that Defendants have filed dipositive motions that fail to comply with the requirements of Rule 12 and Rule 56, since the motions "actually seek[] reconsideration

---

[67] *Id.*

[68] *Id.*

[69] *Id.* at 12.

[70] *Id.* at 15–16.

[71] *Id.* at 17.

[72] *Id.* at 18–19.

of this Court's grant of intervention."[73] The State asserts that the Court should exercise its authority to prohibit successive dispositive motions.[74]

## C.    *Defendants' Arguments in Further Support of the Motion*

In reply, Defendants assert that their motion was properly filed as a motion for judgment on the pleadings, rather than a motion for summary judgment or a motion for reconsideration.[75] Defendants contend that they relied only on the content of the pleadings.[76] Defendants aver that "pleadings" include the allegations contained in all complaints, all responses and defenses raised in Defendants' Answer, Defendants' Motions to Dismiss the original and amended complaints, and Defendants' Opposition to the State's intervention.[77] Defendants argue that their references to Attorney General Opinion No. 21-0103, and to another case where the Attorney General sued the board are "not the type of evidentiary reliance that could convert their [motion for judgment on the pleadings] into a motion for summary judgment, as those items are matters of public record to which a party may refer in a Rule 12 motion."[78] Instead, Defendants argue that the State's opposition fails to comply with the Court's procedural rules by attaching twelve exhibits, along with a declaration purporting to authenticate the documents as evidence.[79] Defendants urge the

---

[73] *Id.* at 21–22.

[74] *Id.*

[75] Rec Doc. 138 at 1.

[76] *Id.*

[77] *Id.* at 1–2.

[78] *Id.* at 2.

[79] *Id.* at 3.

Court to disregard all attachments to the State's opposition that constitute impermissible evidence.[80]

Defendants' again argue that the State lacks standing.[81] Defendants contend that the Court's grant of the Motion to Intervene does not mean that the Court cannot question the State's standing again, as standing must exist at all stages of the proceeding.[82] Defendants assert that the State lacks standing given "the resolution between the former Plaintiffs and Defendants, paired with the lack of any other specific students on whose behalf the AG's intervention is premised or any other specific injuries he seeks to redress."[83]

Defendants contend that the State's reliance on *parens patriae* authority and the State interest in enforcing state laws is insufficient to confer standing.[84] Although the State has interests in the case "in the abstract," Defendants assert that the State must still plausibly allege a "pattern or practice" of violations under Rule 8 of the Federal Rules of Civil Procedure.[85] However, Defendants argue that the State has not identified any other injured parties beyond the original Plaintiffs in this case, and has "pled no common injury specific to any putative class."[86] Defendants argue that "the only other examples of supposed 'civil rights violations' alleged by the AG relate to ancient disability and national origin discrimination claims and teacher's rights issues that haver

---

[80] *Id.*

[81] *Id.* at 5.

[82] *Id.* at 3.

[83] *Id.* at 6.

[84] *Id.* at 7.

[85] *Id.*

[86] *Id.* at 8.

zero factual [connection] or relevance to the claims in this action."[87] Thus, Defendants argue that the State has not established standing under the *parens patriae* doctrine because it has "failed to articulate specific, ongoing actions by the School Board affecting not only the two students who were the former Plaintiffs, but to a significant portion of the state's populace."[88]

Lastly, Defendants reiterate their argument that because BESE has the authority to enforce Louisiana Revised Statute § 17:416, the Attorney General does not.[89] Although Defendants acknowledged that the Louisiana Supreme Court has noted an exception to this general rule in "highly exceptional circumstances," Defendants argue that this exception does not apply.[90] Defendants contend that this exception only applies in three situations: (1) where a state agency has abdicated its duty to enforce the statute at issue; (2) where the Attorney General has expressly been vested with a right of action; or (3) where the State has an interest in the litigation due to ongoing legislative oversight.[91] First, Defendants argue that the State does not allege that BESE has abdicated its duty, but rather that the School Board has failed to comply with the law.[92] Defendants contend that this is not sufficient to fall within the first exception.[93] Second, Defendants contend that the Attorney General is not vested with an express right of action to

---

[87] *Id.* at 9.

[88] *Id.* at 13.

[89] *Id.*

[90] *Id.* at 14.

[91] *Id.*

[92] *Id.*

[93] *Id.*

enforce 17:416.[94] Third, Defendants argue that the "ongoing legislative oversight" exception does not apply based on the Legislature's single amendment of 17:416.[95]

### III. Legal Standard[96]

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."[97] A motion under Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."[98] The motion "is subject to the same standard as a motion to dismiss under Rule 12(b)(6)."[99] "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."[100] In ruling on a 12(c) motion, "[p]leadings should be construed liberally," and judgment is appropriate "only if there are no disputed issues of fact and only questions of law remain."[101] The Court must "accept all well-pleaded facts as true,

---

[94] *Id.* at 15.

[95] *Id.*

[96] The State argues that the instant motion is actual a motion for summary judgment because it "rel[ies] on events outside of and subsequent to the complaint and answer," including "settlements with co-Plaintiffs, a state court judgment, policy changes, and an Attorney General opinion." Rec. Doc. 130 at 4–5. However, because a motion for judgment on the pleadings is "subject to the same standard as a motion to dismiss under Rule 12(b)(6), a court may consider matters "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure 1357 (3d. ed.). "[T]hese items may be considered by the district judge without converting the motion into one for summary judgment." *Id.* Thus, the Court considers the instant motion as one for judgment on the pleadings.

[97] Fed. R. Civ. P 12(c).

[98] *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990)).

[99] *Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

[100] *Great Plains Trust Co.*, 313 F.3d at 312 (citing *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001)) (alteration in original).

[101] *Id.* (quoting *Hughes*, 278 F.3d at 420).

viewing them in the light most favorable to the plaintiff," but need not "accept as true conclusory allegations or unwarranted deductions of fact."[102] The Court "may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitled him to relief."[103]

## IV. Analysis

The issue before the Court is what effect the private plaintiffs' settlement had on the status of this litigation. The parties' briefing makes a slew of overlapping arguments about whether and on what grounds the State (Plaintiffs' Intervenor) can maintain the action absent the private plaintiffs. Given that the private plaintiffs' claims have settled, Defendants contend that the State cannot maintain the lawsuit on its own. Although the briefing is far from clear, JPSB appears to argue that the case must be dismissed for three reasons. First, JPSB asserts that the Court now lacks Article III standing over this matter. Second, JPSB argues that the State no longer has a right to intervene. Third, Defendants contend that Louisiana law prevents the State from maintaining this action. The Court begins with the standing argument.

Federal courts have subject matter jurisdiction only over "cases" and "controversies."[104] "[B]efore a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue."[105] "[T]he doctrine of standing served to identify those disputes which are appropriately resolved through the judicial process."[106]

---

[102] *Id.* at 312–13 (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).

[103] *Id.* at 312.

[104] U.S. Const. Art. III cl. 2

[105] *Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990).

[106] *Id.*

The Supreme Court has established a three-part test to determine whether a case or controversy exists.[107] First, a party must show that she has suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[108] Second, she must show that there is a "casual connection between the injury and the conduct complained of."[109] The injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[110] Third, she must show that it is "likely . . . that the injury will be redressed by a favorable decision."[111] The burden is on the party invoking jurisdiction to establish the existence of a case or controversy.[112] Furthermore, a case or controversy must "be extant at all stages of review, not merely at the time the complaint is filed."[113]

Whether and to what extent intervenors must demonstrate Article III standing has been the subject of extensive litigation. In *Ruiz v. Estelle*, the Fifth Circuit explained that "[t]raditionally, standing was required only of parties seeking to initiate a lawsuit," but that in more recent years "some courts have required intervenors to possess standing as well."[114] The Fifth Circuit then held that "Article III does not require each and every party in a case to have such standing."[115] However,

---

[107] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[108] *Deutsch v. Annis Enterprises, Inc.*, 882 F.3d 169, 174 (citing *Lujan*, 504 U.S. at 560–61).

[109] *Id.*

[110] *Lujan*, 504 U.S. at 560 (cleaned up).

[111] *Id.* at 561.

[112] *Id.*

[113] *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).

[114] *Ruiz v. Estelle*, 161 F.3d 814, 830 (5th Cir. 1998)

[115] *Id.* at 832.

the Supreme Court's decision in *Town of Chester v. Laroe Estates* limited the Fifth Circuit's rule in important respects. The Supreme Court explained that "standing is not dispensed in gross," and thus "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."[116] Applying that principal to intervenors, the Court explained that "[f]or all relief sought, there must be a litigant with standing," and thus an intervenor "must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests."[117] Because standing "must exist at all stages of the proceeding, and not merely when the action is initiated,"[118] it follows that an intervenor must have Article III standing following the dismissal of other parties that had standing and sought the same relief as intervenors.[119]

Considering this precedent, the parties agree that the State must establish standing in order to maintain the suit against Defendants. The State, however, argues that the Court already determined that the State had standing when it granted the State's motion to intervene.[120] The State contends that because *Town of Chester* requires that there be standing for each form of relief sought, the Court already implicitly determined that the State had standing because the State sought additional relief that the private plaintiffs did not seek.[121] The Court rejects the State's suggestion

---

[116] *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

[117] *Id.* at 1651.

[118] *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 348 (5th Cir. 1989).

[119] *Diamond v. Charles*, 106 S. Ct. 1697, 1706 (1986) ("[A]n intervenor's right to continue a suit in the absence of the party on whose side intervention as permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."); *Dillard v. Chilton County Com'n*, 495 F.3d 1324, 1330 (11th Cir. 2007) ("Intervenors must show independent standing to continue a suit if the original parties on whose behalf intervention was sought settle or otherwise do not remain adverse parties in the litigation.")

[120] Rec. Doc. 140 at 5.

[121] *Id.* at 5–6.

19

that this Court ruled, by implication, that the State had Article III standing, an issue that was not briefed by either party when the Court granted intervention. Although the Court acknowledged the State's various interests in the litigation when it granted intervention, interests that are sufficient for a court to permit a party to intervene are not coextensive with the type of interest necessary to demonstrate Article III standing.[122] Thus, the Court's acceptance of the State's interests for purposes of intervention is not sufficient on its own to establish Article III standing. In any event, however, the primary reason that the Court granted the State's motion to intervene—because Plaintiffs raised a constitutional challenge to Section 17:416—is no longer applicable considering that Plaintiffs' claims have been dismissed.[123] Furthermore, in response to these very incidents, the Louisiana legislature revised Section 17:416 to provide additional process for students subject to discipline. Thus, given Plaintiffs' settlement wherein they resolved any challenge to the constitutionality of Section 17:416 and given that no other students are subject to the prior version of Section 17:416, the posture of this case is now quite different than it was when the Court granted the State's motion to intervene.

Regardless of the interests asserted at the intervention stage, as the party invoking the Court's jurisdiction, the State "bears the burden of establishing" its standing.[124] The State does not attempt to articulate a direct injury to the State that is sufficient to establish Article III standing.

---

[122] *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Commission*, 834 F.3d 562 (5th Cir. 2016) (explaining that an interest for purposes of intervention "is sufficient if it is of the type the law deems worthy for protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim."); *Diamond v. Charles*, 476 U.S. 54, 69 (1986) ("The interests [intervenor] asserted before the District Court in seeking to intervene plainly are insufficient to confer standing on him to continue this suit now.")

[123] 20-2916, Rec. Doc. 57.

[124] *Lujan*, 504 U.S. at 561.

Instead, it relies on the doctrine of *parens patriae* to give it standing to maintain this lawsuit.[125] The *parens patriae* doctrine is an exception to the normal rules of standing applied to private citizens.[126] When states attempt to protect their "quasi-sovereign interests," they are entitled to "special solicitude in [the Supreme Court's] standing analysis."[127] The Supreme Court's most comprehensive explanation of this doctrine appears to be in the case of *Alfred L. Snapp & Son Inc. v. Puerto Rico*.[128] The Court explained that the common law conception of this doctrine was to permit the states to "step[] in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves."[129] However, this approach "has relatively little to do with the concept of *parens patriae* standing that has developed in American law."[130] Instead, the Supreme Court has summarized the doctrine as follows:

> In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract—certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

> The Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual

---

[125] Rec. Doc. 140 at 7.

[126] 72 Am. Jur. 2d *Parens Patriae Actions* § 94; *Estados Unidos Mexicanos v. Decoster*, 229 F.3d 332, 335-36 (1st Cir. 2000).

[127] *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

[128] 450 U.S. 592, 600 (1982).

[129] *Id.*

[130] *Id.*

> residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

Thus, the State can maintain this suit as a *parens patriae* action if it (1) can articulate a "quasi-sovereign interest" in the litigation that is separate from the interests of the original private plaintiffs and (2) alleges injury to a sufficiently substantial segment of the population. Furthermore, it appears that some courts interpret *Snapp* as also requiring a finding that "individuals could not obtain complete relief through a private suit."[131]

The Court notes, as the Supreme Court did in *Snapp*, that the concept of quasi-sovereign interests "risks being too vague to survive the standing requirements of Art[icle] III" and "can only be filled in by turning to individual cases."[132] Scholars note that the principle of quasi-sovereign interests are "only infrequently the object of civil litigation,"[133] and that the "doctrine's modern contours have long been vague and illdefined."[134]

    *1.    Quasi-sovereign interest*

As discussed, the Supreme Court has explained that what constitutes a quasi-sovereign interest is "a matter for case-by case development," as neither an "exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract."[135] However, the Court did

---

[131] *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 38-40 (2d Cir. 1982), vacated in part on other grounds, 71 F.2d 22 (2d Cir. 1983) (en banc)

[132] *Snapp*, 458 U.S. at 602.

[133] Richard P. Ieyoub & Theodore Eisenberg, *State Attorney General Actions, The Tobacco Litigation, and the Doctrine of Parens Patriae,* 74 Tul L. Rev. 1859 (2000).

[134] Margaret S. Thomas, *Parens Patriae and the States' Historic Police Power*, 69 SMU L. Rev. 759 (2017).

[135] *Snapp*, 458 U.S. at 607.

recognize that a state has such an interest in (1) the "health and well-being—both physical and economic—of its residents in general" and (2) "securing observance of the terms under which it participates in the federal system."[136]

The State, as the party invoking the Court's jurisdiction, has the burden of demonstrating that it has standing under the doctrine of *parens patriae*. The State appears to assert the following supposed "quasi-sovereign" interests: (1) protecting its citizens' constitutional rights; (2) assuring that the benefits of federal law and civil rights are not denied to its general population; and (3) enforcing its own laws. The State's articulation of these alleged interests evokes the *Snapp* Court's caution that such a broad formulation of the interest "risks being too vague to survive the standing requirements of Art. III."[137] The Supreme Court emphasized that "[a] quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant," and that the "vagueness of this concept can only be filled in by turning to individual cases."[138]

The State's invocation of *parens patriae* standing is far afield from the examples the Supreme Court invoked in *Snapp*. In that case, the Supreme Court pointed to *Pennsylvania v. West Virginia*, where it held that Pennsylvania and Ohio could sue to prevent West Virginia from enforcing a law that would curtail the supply of natural gas to those states.[139] The Court also cited *Georgia v. Pennsylvania R. Co.*, where the Court permitted a State to sue for violations of federal

---

[136] *Id.*

[137] *Id.* at 602.

[138] *Id.*

[139] *Id.* at 605 (citing *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923)). The Court also cited *Maryland v. Louisiana*, 451 U.S. 725 (1981), which, similarly permitted a State to sue to protect its citizens from substantial economic injury due to a tax imposed on natural gas.

antitrust laws that damaged the State's economy.[140] The Court also pointed to numerous examples of *parens patriae* suits involving "the State's interest in the abatement of public nuisances," such as flooding and pollution.[141]

Finally, *Snapp* itself permitted Puerto Rico to maintain a *parens patriae* lawsuit on behalf of its citizens under a federal program designed to give citizens of Puerto Rico a "preference over foreign workers for jobs that become available within this country" and prevent discrimination against Puerto Rican workers in favor of foreign workers.[142] Puerto Rico alleged that the defendants had failed to employ qualified Puerto Rican workers, discriminated against those Puerto Rican workers who were employed, and improperly terminated Puerto Rican workers.[143] The Court held that Puerto Rico had a sufficient quasi-sovereign interest in "securing residents from the harmful effects of discrimination."[144] The Court also found that Puerto Rico had *parens patriae* standing to "pursue the interests of its residents in the Commonwealth's full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952."[145]

These cases are quite different, however, from the circumstances here. First, other than *Snapp* itself, these examples of *parens patriae* standing are all public-nuisance or economic-harm type cases. Indeed, as the Sixth Circuit recently noted, "[t]he classic [*parens patriae*] cases involve

---

[140] *Snapp*, 458 U.S. at 605 (citing *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439 (1945).

[141] *Id.* at 605–06.

[142] *Id.* at 596.

[143] *Id.* at 598.

[144] *Id.* at 609.

[145] *Id.*

public nuisances, in which a state sues to prevent pollution that not only injures its citizens but also invades the state's prerogative to superintend the public health."[146] The Court in *Snapp*, of course, also recognized a quasi-sovereign interest in "securing residents from the harmful effects of discrimination."[147] Although here the State asserts general interests in protecting its citizens rights,  the State does not identify any case in which the *parens patriae* doctrine was invoked in circumstances similar to those here, much less any binding case from the Fifth Circuit.[148] Instead, the State relies on a forty-year-old Third Circuit case, as well as district court cases from other circuits, for the general proposition that states can bring suits for injunctive relief to protect their citizens' constitutional rights.[149] But those cases similarly arose in quite different contexts, and, as explained more below, involve a State suing to prevent harms to its citizens broadly.[150] Absent some authority applying the *parens patriae* doctrine in a similar context, the State's mere invocation of an interest in protecting its citizens is "too vague to survive the standing requirements of Article III."[151]

---

[146] *Kentucky v. Biden*, __ F.4th__, 2022 WL 43178 (6th Cir. 2022). *See also Oregon v. Legal Services Corp.*, 552 F.3d 965, 970 (9th Cir. 2009) ("Generally, a state has been granted standing under the parens patriae doctrine in situations involving the abatement of public nuisances, such as global warming, flooding, or noxious gases.")

[147] *Snapp*, 458 U.S. at 609.

[148] The State does cite several Fifth Circuit cases in support of its argument that the State's interest is different from that of the private plaintiffs. Rec. Doc. 130 at 9. But none of those cases involved standing based on the doctrine of *parens patriae*, and instead were enforcement actions brought by the EEOC.

[149] Rec. Doc. 130 at 8 (citing *Pennsylvania v. Porter*, 659 F.2d 306, 311 (3d Cir. 1981), *New York v. Utica City School District*, 177 F. Supp. 3d 739 (N.D.N.Y. 2016), and *Illinois v. City of Chicago*, 2019 WL 398703 (N.D. Ill. Jan 31, 2019).

[150] *Porter*, 659 F.2d at 311 (suing to enjoin a pervasive pattern of police misconduct); *New York v. Utica City School District*, 177 F. Supp. 3d 739 (N.D.N.Y. 2016) (suing to enjoin a longstanding discriminatory practice of diverting all immigrant students to non-traditional school programs).The State also cites *Illinois v. City of Chicago*, 2019 WL 398703 (N.D. Ill. Jan 31, 2019) in support of its argument for *parens patriae* standing. However, although in that case the district court acknowledged the Third Circuit's decision in *Porter*, the court did not reach the *parens patriae* standing question because it was "underdeveloped on the current record."

[151] *Snapp*, 458 U.S. at 602.

25

2.      *Substantial Segment of the Population*

Additionally, the State has not met its burden of alleging injury to a "sufficiently substantial segment" of the population. The cases cited by the Supreme Court in *Snapp*, and those cited by the State in its opposition, each appeared to involve harms to the entirety of the States' citizenry, rather than a few individuals.[152] The Court in *Snapp* stressed repeatedly, however, that a State "must articulate an interest apart from the interests of particular private parties," and must allege injury to a "sufficiently substantial segment" of the population.[153]

As discussed above, the Louisiana legislature amended and/or clarified Section 17:416 in two ways that are important to this case. First, the legislature made clear that students or parents of students who are recommended for expulsion may appeal the decision even if the expulsion is reduced to a suspension.[154] Thus, the right to appeal any such decision is no longer in dispute, and there is no "substantial segment" of the population being denied an appeal in these circumstances. Second, the amended statute requires that any discipline policy "shall clearly define the rules of conduct and expectations of students engaged in virtual instruction, shall provide for notice of such rules and expectations to the parents and guardians of students, shall include clearly defined consequences of conduct, shall be narrowly tailored to address compelling government interests."[155] The State's Complaint in Intervention appears to assert that the Interim Virtual Discipline Policy does not comply with this provision.[156] However, it does not allege any concrete

---

[152] *Pennsylvnia v. West Virginia*, 262 U.S. 553 (1923) (residents' access to natural gas); *Georgia v. Pennsylvania R. Co*., 324 U.S. 439 (1945) (harm to State's economy); *Georgia v Tennesee Copper Co*., 206 U.S. 230 (1907) (pollution causing damage to forests and vegetation).

[153] *Snapp*, 458 U.S. at 607.

[154] *See* La. Rev. Stat. § 17:416(c).
[155] La. Rev. Stat. § 17:416(K).

[156] 20-2916, Rec. Doc. 58.

harm to any individuals other than the private plaintiffs, much less a "substantial segment of the population." In an appropriate case, a disciplined student, who theoretically could be harmed in the future, may be able to sue to enforce compliance with the revised version of Section 17:416. However, any such future claim is purely speculative at this point. Therefore, the State has not alleged any concrete injury to a sufficiently substantial segment of the population, and the State has failed to establish standing under the *parens patriae* doctrine.

The State does cite one recent case, decided by a district judge in another circuit, that involved a State Attorney General's assertion of *parens patriae* standing against a school district.[157] In *New York v. Utica City School District*, decided by a district judge in the Northern District of New York, the New York Attorney General ("OAG") sued the school district alleging that the defendants discriminated against "immigrant students aged 17-20" who "have, or are perceived to have, a limited ability to speak English," by having them "systematically diverted" to other schools.[158] OAG brought claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause and Due Process Clauses of the Fourteenth Amendment, the Equal Educational Opportunities Act of 1974 and Title VI of the Civil Rights Act of 1964, and also brought New York state law claims.[159] The district court found that OAG had standing under the doctrine of *parens patriae*. First, the court held that OAG properly alleged the State's "quasi-sovereign interest" in "eradicating discrimination in educational opportunities," citing to various cases, including *Snapp* itself, where a State was permitted to sue to protect its citizens from

---

[157] *New York v. Utica City School District*, 177 F. Supp. 3d 739 (N.D.N.Y. 2016).

[158] *Id.* at 743.

[159] *Id.*

discrimination.[160] Second, the court found that the "relatively large and still growing population of [limited English proficiency] children of immigrants families that reside within the district" was a sufficiently "substantial segment" of the population.[161]

To begin, the Court notes that *New York v. Utica School District* is not binding on this Court, as it was decided by a district judge in the Northern District of New York. Moreover, the case is of little persuasive value, given its differences to the matter before this Court. Though *New York v. Utica School District* is similar to this case in the sense that both involved a State suing on behalf of schoolchildren, the cases are vastly different in the nature and breadth of the harm alleged. First, OAG alleged a quasi-sovereign interest in "eradicating discrimination," which *Snapp* itself recognized as an appropriate interest for purposes of the *parens patriae* doctrine. Moreover, OAG alleged a "policy and practice" where, beginning in 2007, "district officials began systematically diverting any immigrant student aged 17-20 who sought to enroll at Proctor High School into [an alternative] program, regardless of whether or not the student expressed a wish to attend 'regular' high school."[162] At the same time, OAG alleged that district officials "refrained from entering information into the District's student databases about immigrant students who attempted to enroll," which permitted the District to avoid letting those students take an English proficiency test.[163] OAG alleged that this was a "permanent program" that "continued in one form or another until the fall of 2014" until it was replaced by a more formal policy.[164] Thus, there was

---

[160] *Id.* at 748.

[161] *Id.*

[162] *Id.* at 744.

[163] *Id.*

[164] *Id.* at 745.

ample basis for the district court to conclude that the "relatively large and still growing population" of children affected was a sufficiently "substantial segment" of the State's population to satisfy the doctrine of *parens patriae*.

Here, however, there is no allegation of widespread injury to a sufficiently substantial segment of the State's population. Although the State's complaint asserts that "JPSB has a policy, practice, or custom" of violating the rights of students and parents,[165] in opposition to the instant motion the State appears to rely only on the plaintiffs in this consolidated matter to allege such a practice.[166] The State cites *Ferrari v. County of Suffolk*, decided by a district judge in the Eastern District of New York, for the proposition that "'identifying, without the benefit of discovery, two other instances' was enough to 'permit a plausible inference of a widespread practice or informal custom.'"[167] However, *Ferrari* is not binding on this Court, nor is persuasive to this Court's inquiry. That case did not involve a claim of *parens patriae* standing by a state; rather, an individual plaintiff brought a failure to train claim under *Monell* against Suffolk County, New York.[168] Furthermore, that court found that *three* incidents permitted a plausible inference of a widespread

---

[165] Rec. Doc. 40–4 at 21.

[166] Rec. Doc. 130 at 10. ("[T]hat this Court has multiple cases alleging similar due process and privacy violations by Defendants establishes that a pattern, practice, or policy of such violations is plausible.") The State's opposition also purports to rely on its invocation in the Complaint of "JPSB's long history of constitutional and civil rights violations." *Id.* In the Complaint, the State cites to various agreements between JPSB and the U.S. Department of Education as well as various state court cases in which JPSB was a defendant. However, none of these appear to be related to the alleged violations at issue here.

In a footnote, the State also asserts that "[d]iscovery reveals that hundreds of students have been disciplined for conduct in the privacy of their homes." Rec. Doc. 130 at 11, n.6. But the State does not allege that these instances involved the same or similar conduct to that at issue here. The Court does not understand the State's position to be that the JPSB may *never* discipline students for conduct that occurs at home but during virtual learning. Instead, the State asserts that JPSB acted ultra vires by "regulat[ing] non-disruptive conduct in a student's private home." 20-2916, Rec. Doc. 58 at 19.

[167] *Ferrari v. County of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011).

[168] *Id.*

practice or custom, while the instant case involves only two.[169] Moreover, here, the two cases have been resolved and thus are no longer pending. Given these differences, the decision in *Ferrari* is not sufficient for the State to meet its burden of making a non-conclusory allegation that the injury affected a sufficiently substantial segment of the population.

## V. Conclusion

The State's asserted interest in this case is "too vague to survive the standing requirements of Article III,"[170] and therefore the case must be dismissed. This result is unsurprising, as the State of Louisiana has already acted by amending the relevant statute, and Plaintiffs have resolved and dismissed their claims against Defendants. The State now asks the Court to make various declarations as to the scope of **Section 17:416 and whether JPSB had a policy or practice of violating it, and to enjoin JPSB from further violations of this statute** despite the recent amendment. Absent any concrete Article III injury that is sufficient to invoke this Court's jurisdiction, the Court cannot wade into this dispute between the State and its political subdivision over the administration of Louisiana schools.

As the party invoking the Court's jurisdiction, the State has failed to carry its burden of demonstrating that it has Article III standing under the doctrine of *parens patriae*. Because the Court finds that the State has not met its burden of demonstrating *parens patriae* standing, the Court need not address JPSB's additional argument that the Attorney General lacks authority to sue under state law. Thus, the Court must grant JPSB's motions for judgment on the pleadings.

Accordingly,

---

[169] *Id.*

[170] *Snapp*, 458 U.S. at 602.

**IT IS HEREBY ORDERED** that JPSB's Motions for Judgment on the Pleadings[171] are

**GRANTED**.

   **NEW ORLEANS, LOUISIANA,** this ___23rd___ day of February 2022.

_Nannette Jolivette Brown_
   **NANNETTE JOLIVETTE BROWN**
   **CHIEF JUDGE**
   **UNITED STATES DISTRICT COURT**

---

[171] Rec. Docs. 127, 139.